Anthony **HERBERT**, Plaintiff,

v.

Barry **LANDO**, Mike Wallace, Columbia Broadcasting System, Inc., Atlantic Monthly Company, Defendants.

No. 74 Civ. 434–CSH.

United States District Court, S.D. New York.

Oct. 10, 1984.

As Amended Oct. 18, 1984.

---

Cohn, Glickstein, Lurie, Ostrin, Lubell & Lubell, New York City, for plaintiff; Jonathan W. Lubell, Mary K. O'Melveny, New York City, of counsel.

Coudert Brothers, New York City, for defendants CBS, Inc. and Mike Wallace; Carleton G. Eldridge, Jr., Pamela G. Ostrager, New York City, of counsel.

Green & Hillman, New York City, for defendant Barry Lando; Richard G. Green, Adria S. Hillman, Nancy S. Hobbs, New York City, of counsel.

Ronald E. Guttman, Associate Gen. Counsel, CBS, Inc., New York City, for CBS, Inc.

Rembar & Curtis, New York City, for defendant The Atlantic Monthly Co.; Charles Rembar, Frank R. Curtis, Mark W. Budwig, New York City, of counsel.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This is an action for defamation. Jurisdiction in this Court is based upon diversity of citizenship. Following extensive discovery, all defendants now move for summary judgment under Rule 56, F.R.Civ.P.

### I.

#### *Introduction*

*The Parties*

Plaintiff Anthony Herbert is a retired Army officer who had extended wartime service in Vietnam and who received widespread media attention when he accused his superior officers of covering up reports of atrocities and other war crimes, and of relieving him of his combat command when he persisted in such reports.

Defendants Barry Lando, Mike Wallace, and Columbia Broadcasting System, Inc. ("CBS") were involved with a television report on Herbert and his accusations which CBS broadcast on February 4, 1973 as part of its weekly "60 Minutes" program. Lando and Wallace were CBS employees. Lando researched and produced the program segment dealing with Herbert. Wallace narrated it, and also participated in preliminary interviewing and editing.

Lando thereafter wrote an article relating to Herbert which defendant Atlantic Monthly Company ("Atlantic Monthly") published in its May, 1973 issue.

*The Allegations of the Complaint*

Herbert's complaint contains two counts. Count One alleges that the February 4, 1973 "60 Minutes" program entitled "The Selling of Colonel Herbert" (hereinafter "the program") defamed him. The defendants in this count are Lando, Wallace, and CBS. Count Two alleges that Lando's article appearing in the May, 1973 issue of *The Atlantic Monthly* magazine entitled "The Herbert Affair" (hereinafter "the article") also defamed him. The defendants in Count Two are Lando and Atlantic Monthly.

Specifically, Herbert alleges that the program and the article defamed him in the following respects, as summarized in plaintiff's brief on the present motion at 2–3:

"1. Herbert is presented as not having reported war crimes to his superior officers, Col. J. Ross Franklin and Brig. Gen. John W. Barnes, while serving as Commander, 2d Battalion with the 173d Airborne Brigade in Vietnam, and thereby portrayed as a liar and as one guilty of violating the very military laws he accused his commanders of violating;

"2. Herbert is presented as never mentioning war crimes until My Lai became public, and thereby portrayed as a liar who falsely used the country's concern over war crimes as a means of explaining his own relief from command of the 2d Battalion of the 173d;

"3. Herbert is presented as a man capable of brutal acts and of condoning brutality against the Vietnamese population, detainees and prisoners, and thereby portrayed as a violent, sadistic and brutal man who violated the rules that were to govern his behavior as a soldier and an officer and who hypocritically accused others of criminal behavior of which he was guilty;

"4. Herbert is presented as a man who repeatedly lied not only in his charges regarding war crimes and command cover-up but also in his book *Soldier* concerning a number of events, and thereby portrayed as a liar and a fraud."

*The Asserted Defenses*

Defendants Lando, Wallace and CBS assert four defenses to the complaint. Wallace and CBS are concerned only with the program. Lando, who produced the program and wrote the Atlantic Monthly article, asserts the same four defenses in respect of both.

The first defense asserted by these defendants is premised upon *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. While the defendants contend that the program and the article are careful and accurate reports of the Herbert controversy, they also contend that in any event, no reasonable jury could find that the defendants published with actual malice. On this branch of their argument, defendants assert that the pre-trial discovery and the additional exhibits submitted with the motion demonstrate as a matter of law that at trial, Herbert could not meet his burden of showing by clear and convincing evidence that the defendants had knowledge of falsity or acted with reckless disregard for the truth. In these circumstances, the argument concludes, summary judgment should now be entered dismissing the complaint.

Secondly, these defendants contend that the program and the article constitute protected reportage of a public controversy about a public figure and public official. That argument is premised primarily upon the Second Circuit's opinion in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.1977).

Third, these defendants contend that the program and article constitute protected expressions of opinion about a public figure and a public controversy.

Lastly, these defendants contend that the selection of information for inclusion in the program and article was a matter of editorial judgment as to which the courts have no role.

Defendant Atlantic Monthly, as publisher of the article, relies upon the first of these defenses, arising from the principles declared in *New York Times Co. v. Sullivan* and later cases.

*History of the Litigation*

Following filing of the complaint and joinder of issue, extensive discovery ensued. A time came, however, when the CBS defendants (Lando, Wallace and their corporate employer) balked at giving discovery in respect of what they termed their "editorial process."

Specifically, Herbert sought to inquire into Lando's conclusions and state of mind during the course of his research; conversations between Lando and Wallace about matters to be included or excluded from the broadcast publication; and Lando's intentions as manifested by his decision to include or exclude certain material. This Court held that Herbert was entitled to discovery in these areas. 73 F.R.D. 387 (S.D.N.Y.1977). A divided panel of the Second Circuit reversed. 568 F.2d 974 (2d Cir. 1977). The Supreme Court granted certiorari and reversed the Court of Appeals, reinstating this Court's judgment. 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). Thereafter considerable additional discovery took place.

Upon completion of discovery these motions were filed. No party suggests that additional discovery is required, or even possible. The present record constitutes the record that would be made at trial. Defendants' motions test whether a trial is necessary.

The first sections of this opinion will consider the issue of "actual malice" arising out of *New York Times v. Sullivan* and later cases. I begin that consideration with preliminary discussions of plaintiff's burden of proof, and the standards to be applied in evaluating a defendant's motion for summary judgment.

## II.

*The Burden of Proof Applicable to a Public Figure Who Sues for Defamation*

■ Plaintiff Herbert's cause of action arises under New York State defamation

law. However, in *New York Times v. Sullivan* the Supreme Court announced a constitutional rule. It is that, with respect to the alleged libels of public officials, the First and Fourteenth Amendments preclude recovery absent proof that the defendant had published a damaging falsehood "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan, supra*, 376 U.S. at 280, 84 S.Ct. at 726. "The approach of *New York Times* was to identify a class of person—there public officials—and a type of activity—there official conduct—and to require as to defamations respecting them a particularly high standard of liability—knowing falsehood or reckless disregard of the truth." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971). The *New York Times* rule was extended to "public figures" by *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

 In the case at bar, Herbert concedes that by reason of his much publicized charges against the Army and his superior officers, he is a "public figure" within the meaning of the *New York Times* rule. Indeed he is. The Second Circuit recently summarized the criteria. An individual is a "limited purpose public figure" if he has: "(1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123 (2d Cir., 1984) at 136. Herbert's much publicized war with the Army satisfies all these criteria.

Defendants argue that by virtue of his former military rank, Herbert should also be regarded as a "public official." Herbert disputes that characterization. I need not resolve the issue, because the burden of proof falling upon Herbert under the *New York Times* rule is in either event the same.

That burden was most recently articulated by the Supreme Court in *Bose Corp. v. Consumers Union of U.S. Inc.*, —— U.S. ——, —— n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984):

> "The burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement."

 As Judge Friendly observed for the Second Circuit in *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 59 (1980), a plaintiff "within the ambit of *Sullivan*" also has, "at least as a practical matter, the burden of proving falsity, since he must in any event establish that defendant published with knowledge of falsity or reckless disregard of the truth." However, the Supreme Court in *Bose* specifically recognized that "there is a significant difference between proof of actual malice and mere proof of falsity," 104 S.Ct. at 1965.

Proof of actual malice is a more stringent burden. It requires a public figure plaintiff to demonstrate actual malice by "clear and convincing evidence." Under the "clear and convincing" burden, "a mere preponderance of the evidence is not enough." *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.1977). The "clear and convincing" standard is "intermediate between the normal 'preponderance of the evidence' civil standard and the 'beyond the reasonable doubt' criminal standard," *Yiamouyiannis v. Consumers Union of the U.S., Inc.*, 619 F.2d 932, 940 (2d Cir. 1980), quoting *Nader v. de Toledano*, 408 A.2d 31, 49 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

*New York Times* articulated two bases for a finding of "actual malice": publishing with knowledge that the statement was

false, or with reckless disregard of whether it was false or not. "Knowledge of falsity" means what it says. Later cases further define the concept of "reckless disregard" for truth. In *Herbert v. Lando, supra,* the Supreme Court said that "absent knowing falsehood, liability requires proof of reckless disregard for truth, that is, that the defendant 'in fact entertained serious doubts as to the truth of his publication.'" 441 U.S. at 156, 99 S.Ct. at 1638, quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). As *Gertz v. Robert Welch Inc., supra,* makes clear and *Bose Corp. v. Consumers Union of U.S., Inc., supra,* reiterates, the plaintiff must prove on the part of the defendant a "subjective awareness of probable falsity," *Gertz,* at 418 U.S. 335, n. 6, 94 S.Ct. at 3005 n. 6; such a finding may be inferred if, *inter alia,* "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson, supra,* 390 U.S. at 732, 88 S.Ct. at 1326. And in *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), the Court characterized statements made in reckless disregard of truth as "those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times ....*" This formulation in *Garrison,* a state prosecution for criminal libel, is pertinent because in *Herbert v. Lando,* the Court cited *Garrison* for the proposition that "[c]riminal libel prosecutions are subject to the same constitutional limitations" as pertain to defamation actions by public officials or public figures. 441 U.S. at 156 n. 1, 99 S.Ct. at 1631 n. 1.

The element of subjective awareness is critical to the *New York Times* line of authority. It is not sufficient for a public figure plaintiff to prove that the defendant publisher, judged by the objective standard of the reasonable man, should have known that the defamatory statement was false; or that further investigation would have revealed the falsity. "[E]rrors of fact caused by negligence" are not compensable under *New York Times. Time, Inc. v. Pape,* 401 U.S. 279, 292, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971). A trial judge may not instruct the jury that the defendant publisher's liability turns upon whether or not he acted with a "belief founded on reasonable grounds of the truth of the matter published," since that standard "is far less stringent than that of knowing falsehood or reckless disregard of the truth," *Monitor Patriot Co. v. Roy, supra,* 401 U.S. at 273, 91 S.Ct. at 626. These related principles are summarized in *St. Amant v. Thompson, supra,* 390 U.S. at 731, 88 S.Ct. at 1325:

> "... reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

In *Herbert v. Lando, supra,* the Court observed that:

> "... *New York Times* and its progeny made it essential to proving liability that the plaintiff focus on the conduct and state of mind of the defendant. To be liable, the alleged defamer of public officials or of public figures must know or have reason to suspect that his publication is false. In other cases proof of some kind of fault, negligence perhaps, is essential to recovery." 441 U.S. at 160, 99 S.Ct. at 1640 (footnote omitted).

Citing *Herbert,* the Second Circuit held in *Lerman, supra,* that "'actual malice' as is implied in that expression is a subjective test focused on the defendant's state of mind." At 140. The state of mind requisite for liability is knowledge of actual or probable falsity. Cf. *Herbert v. Lando, supra,* at 172, 99 S.Ct. at 1646. "If such proof results in liability for damages which in turn discourages the publication of erroneous information *known to be false or probably false,* this is no more than what our cases contemplate and does not abridge either freedom of speech or of the press" (emphasis added).

## III.

### Applicable Standards in Evaluating Defendants' Summary Judgment Motions

 The standards to be applied by trial courts in this Circuit in evaluating a defendant's motion for summary judgment on the "actual malice" issue are set forth in *Yiamouyiannis, supra.* The public figure defamation case is regarded for summary judgment purposes as any other; "neither grant nor denial of a motion for summary judgment is to be preferred." 619 F.2d at 940. However, as Judge Oakes observed in *Yiamouyiannis,* the court need not be concerned by the general inappropriateness of summary judgment to "state of mind" issues where (as in the case at bar) "the evidence on actual malice has been fully marshalled" by pre-trial discovery, and the parties do not "seek or suggest the need of further discovery..." *Ibid.* In such circumstances, *Yiamouyiannis* describes the proper procedure in these terms:

"In a case where the defendant has moved for summary judgment on the issue of actual malice and the plaintiff claims that there remain material factual disputes, the court decides the materiality of the disputed facts by accepting the plaintiff's version and applying the actual malice standard. This standard requires a clear and convincing showing, which may be by circumstantial evidence, of defendant's actual state of mind—either subjective awareness of probable falsity or actual intent to publish falsely. Therefore, a judge in denying a defendant's summary judgment motion must conclude that, based on the evidence asserted in the plaintiff's affidavits, 'a reasonable jury *could find* malice with convincing clarity.'" 619 F.2d at 940 (quoting *Nader v. de Toledano, supra,* at 49, emphasis in original).

 To state the converse, a defendant should be granted summary judgment if "a properly instructed jury could not fairly and rationally conclude upon clear and convincing evidence" that defendant's publications of false and defamatory statements "were knowing or made with actual malice," thereby demonstrating "defendant's requisite fault with respect to the factual error disseminated," *Lerman, supra,* at 141, 142.

Such a ruling is one of law, not fact. The public figure, plaintiff, to survive a motion for summary judgment, is not required to prove actual malice with convincing clarity *to the motion judge. Nader v. de Toledano, supra,* at 408 A.2d 49. Resolution of genuine issues of fact are for the jury. But where it appears that no reasonable jury could find actual malice with convincing clarity, the defendant is entitled to summary judgment.

 Having made these general observations, one must also recall the Supreme Court's recognition in *St. Amant v. Thompson, supra,* that the concept of "reckless disregard ... cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law." 390 U.S. at 730–731, 88 S.Ct. at 1325. Thus the evidence in each case with respect to the allegedly false and defamatory statements must be carefully analyzed. Where, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could make the requisite finding of actual malice, the case is for the jury. *Goldwater v. Ginzburg,* 414 F.2d 324, 337 (2d Cir.1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). It is equally clear, however, that in an appropriate case summary judgment in favor of defendant will lie. *Yiamouyiannis, supra; Lerman, supra; Loeb v. New Times Communications Corp.,* 497 F.Supp. 85 (S.D.N.Y.1980); *Reliance Insurance Co. v. Barron's,* 442 F.Supp. 1341 (S.D.N.Y.1977).

In the light of these authorities, I turn to the particulars of the case at bar.

## IV.

### Genesis of the Program

Herbert is a much-decorated soldier who enlisted in the United States Army as a

private in 1947, at the age of 17. He retired on February 29, 1972 with the rank of Lieutenant Colonel.

Herbert served in Vietnam from September 1968 to July 1969. From February 6 to April 4, 1969, he commanded the 2d Battalion of the 173d Airborne Brigade. General John W. Barnes commanded the brigade. Colonel J. Ross Franklin was deputy commander.

On April 4, 1969 Barnes relieved Herbert of his command of the 2d Battalion. From April 5 to July of 1969 Herbert was assigned to the Capital Military Assistance Command in Saigon.

Herbert protested his relief from command by Barnes. While at Saigon he initiated a proceeding under Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938, seeking redress on the ground that his relief had been without justification. Major General Joseph R. Russ presided over a board which, after hearing a number of witnesses including Herbert, Barnes, and Franklin, denied Herbert redress.

Herbert was transferred from Vietnam and reported to the Command and General Staff College at Fort Leavenworth in July of 1969. Subsequently he was assigned to Fort McPherson. On September 28, 1970 Herbert filed with the Inspector General's office at Fort McPherson formal charges that war crimes and atrocities were committed in Vietnam by elements of the 173d Airborne Brigade. Herbert also filed charges against Barnes and Franklin for failure to investigate or report these incidents, which Herbert listed specifically. These charges generated three investigations by the Army's Criminal Investigation Department ("CID"). Herbert also sought review of the negative efficiency report accompanying his relief from command. This administrative review is known as a "reclama." Ultimately all of Herbert's charges were rejected, and the review denied.

Herbert retired from the Army. With James Wooten, a *New York Times* reporter, he wrote an autobiography called *Soldier* which attacked the Army and its treatment of him. Herbert appeared on numerous television and radio shows to press those charges and publicize his book.

Herbert first met Barry Lando on July 1, 1971. On that date Lando, then a news writer for CBS, interviewed Herbert at a motel in Natural Bridge, Virginia. The interview covered Herbert's background, the mistreatment of Vietnamese prisoners, Herbert's war crime charges, the Army's investigations of them, and Herbert's anticipated retirement from the Army. Herbert impressed Lando favorably. A part of that interview was broadcast on CBS Weekend News on July 7, 1971. Lando kept in touch with Herbert, and met with Herbert and his attorneys on three occasions in Atlanta during February and March 1972. By this time the Army had exonerated Barnes and Franklin of Herbert's charges, and Herbert had left the Army.

In September 1971 Lando had become one of several producers on "60 Minutes," CBS's popular weekly news program. In early March 1972 he recommended to Wallace that the program do a favorable report on Herbert. Wallace disagreed. He considered that "60 Minutes" could not add to the public's knowledge of Herbert, and that the program should not promote him further. Wallace also expressed skepticism of some of Herbert's claims. Lando persisted. Wallace told him to pursue his inquiries and obtain additional material.

Over the ensuing months, concurrently with other assignments, Lando continued interviewing individuals and examining documents about Herbert. He received considerable cooperation from the Army, stopping short, however, of a release of the Barnes and Franklin investigatory files. All told, in preparation for the program, Lando interviewed more than 120 people and examined thousands of documents. He conferred frequently with Wallace. Lando says (affidavit, ¶ 35) that as the result of his investigation he concluded that the Army's investigations were not a whitewash, and that Herbert had not been relieved of command for trying to report war crimes to his superiors. Those conclusions

persuaded Wallace that a segment on Herbert would be sufficiently newsworthy for "60 Minutes." The program was constructed, edited, and aired on February 4, 1973. I will consider it in some detail.

## V.

### Contents of the Program

As noted, the program aired on Sunday, February 4, 1973. Captioned "The Selling of Col. Herbert," it comprised one of the three 20-minute segments on the "60 Minutes" broadcast that evening. The program consists of edited excerpts of filmed interviews of Herbert and others, interspersed with comments by Wallace. The transcript is in evidence on these motions.

Wallace commences the segment by stating: "One of the sad legacies of our years in Vietnam is the distrust of the American military establishment the war planted in the minds of millions of Americans." Herbert is identified as one who helped to breed that suspicion. Wallace refers to Herbert's book "Soldier" as "a savage indictment of the Pentagon in general and some of its top officers in particular." Wallace identifies one of Herbert's aims as "proving that his military career was destroyed by the Pentagon only because he tried to report war crimes, atrocities, in Vietnam to his superior officers." Wallace concludes his introduction:

> "60 Minutes set out to investigate the validity of Herbert's allegations. In the course of the last year, producer Barry Lando talked with scores of people in and out of the service—people who have known Herbert and the Army. Here is our report."

The program then displays an excerpt from a prior Dick Cavett interview with Herbert, in which Herbert described the so-called "St. Valentine's Day Massacre" at Cu Loi. Herbert described for Cavett the massacre of Vietnamese civilians by South Vietnamese "national police" acting "under an American's charge." Wallace, resuming, says:

> "As Herbert tells it, then and now, he tried repeatedly to have this and other alleged war crimes investigated by his commanders in Vietnam. As a result, he says, he was relieved of command and had his career ruined by an Army establishment intent on covering up atrocities."

Wallace goes on to describe Herbert's distinguished military record, culminating in his appointment as commander of the Second Battalion of the 173d Airborne Brigade. Wallace says:

> "Again Herbert excelled. In only 58 days he won a Silver Star and three Bronze Stars. But then, abruptly, in April of 1969, he was relieved of command by the same officer who had given it to him, General John Barnes."

The program then focuses upon Barnes, undergoing questioning by Lando and Wallace. Barnes expresses the view that Herbert was "a killer," that he "enjoyed killing," and would cause Barnes trouble in "the pacification," although in response to Lando's questions Barnes acknowledged that he had no "hard evidence" to show that Herbert was a "killer," and that Herbert's evident enjoyment in leading squads in the field with a M-16 rifle could "just be a sign of bravery." Barnes also expressed suspicion with Herbert's high body counts. And Barnes added: "I just didn't have confidence in him. I'd lost confidence in him as a commander with the ability to control his people."

These exchanges then occurred. Because of their central significance to the issues I quote them verbatim:

> "LANDO: Did Colonel Herbert ever formally or informally report any war crimes or atrocities to you?
>
> "BARNES: He himself never did to me. Absolutely not. If he had, I would have taken the same action I did when I learned of atrocities anywhere. If they are under my responsibility, I would have court-martialed the man responsible for it, as I told every replacement that came into the brigade.

"WALLACE: General Barnes' deputy commander was Colonel Ross Franklin. It was he who recommended to Barnes that Herbert be relieved. One reason, says Franklin, is that he had come to feel he could not trust Herbert's word.

"FRANKLIN: Tactically, he was the best battalion commander we had. I counseled Herbert several times and once I counseled him on telling the truth or being more exact in what he said. I told him at that time that he could run circles around all the rest of the battalion commanders if he'd just tell the truth.

"WALLACE: Did Colonel Herbert ever report war crimes or atrocities of any nature to you, Colonel Franklin?

"FRANKLIN: No.

"WALLACE: Never?

"FRANKLIN: Never.

"WALLACE: Verbally or in writing?

"FRANKLIN: In no way, either orally or in writing. This—I had many conversations with Colonel Herbert. We discussed many things, but never war crimes."

Wallace resumes the narrative, describing Herbert's unsuccessful effort to obtain redress after losing his command, and the filing of Herbert's court-martial charges against Barnes and Franklin. On the latter point, Wallace says:

"And then in September 1970, 17 months after he had been relieved of command, with the headlines filled with news of the My Lai trials, Colonel Herbert filed his war crimes charges with the Army Inspector General. Six months later, Colonel Herbert went public."

Franklin expresses his inability to understand why Herbert "has come up with totally fictional charges."

Responding to Wallace, Herbert reiterates his claim that he was relieved from command because of his insistence on having war crimes investigated. Wallace then observes that, "in almost all the cases" where Herbert claims to have reported war crimes to Franklin or Barnes, it was only Herbert's word against theirs. "So what we decided to do," Wallace says, "was to zero in on the one case where there's a possibility, anyway, of proving who's telling the truth—without relying on your word against their word."

Wallace then summarizes Herbert's account of speaking to Colonel Franklin by radio from the field on February 14, 1969, immediately after the Cu Loi killings, and then flying directly back to "Landing Zone English" later that day to report the incident personally to Franklin. Franklin then appears on the program to say that on February 14 he was "on R & R" (rest and rehabilitation) in the Ilikai Hotel in Honolulu, Hawaii and did not return to Vietnam until February 16. Herbert says: "If he [Franklin] says he wasn't there, I say he's lying." But Herbert acknowledges he cannot prove it. Wallace says: "60 MINUTES tried to find out who was telling the truth." Wallace then describes inquiries made by the producers at the Ilikai Hotel, leading to a hotel bill and Franklin's cancelled check payable to the hotel, "which means," Wallace states, "that he had to be in Hawaii to pay his bill himself on the 14th of February; therefore could not have been where you said he was on the 14th of February." Wallace also says that the 60 Minutes staff spoke with two Army officers who were in Hawaii at the same time, and who said that they flew back to Vietnam with Colonel Franklin, "taking off from Honolulu late on February 14, arriving at Camranh Bay in Vietnam on February 16, local time." Wallace shows Herbert the hotel bill and Franklin's check, and there is a colloquy about them.

Wallace then states:

"In his book, Colonel Herbert writes that there are several people who can testify that Franklin was in Vietnam on February the 14th. We asked Herbert for the names of those men. We contacted almost every one of them. None could confirm Herbert's claim. Several men serving under Herbert said they had heard Herbert say, while in Vietnam, that he had reported the February 14 killings, but none were certain that he had actually reported them."

General Barnes materializes at this point to express puzzlement that, during Herbert's three months in Saigon for the Article 138 inquiry, he failed "to jot something down on a piece of paper, to get it notarized." That prompts Wallace to observe to Herbert that Herbert has no documents to show that he "ever reported a war crime to anybody prior to the time that the My Lai trials were going on at Fort McPherson in Georgia." Herbert debates the documentation issue with Wallace; reiterates that he reported atrocities to Franklin and Barnes; again calls them liars; and again insists that the Army deprived him of his military career because he insisted upon reporting war crimes and the Army wanted them covered up.

Wallace then focuses the audience's attention upon the Longbinh Army base just outside Saigon, where Herbert went to appeal his relief from command—"and also, he says, to present his war crimes charges." Wallace repeats Herbert's charge that Herbert spoke to Colonel John Douglass, a "U.S. military lawyer and judge in the country." Wallace states: "Herbert claims that Douglass listened to his story and then told him he wouldn't touch war crimes charges against a general with a ten-foot pole." Douglass then appears on the program, being interviewed by Wallace. Douglass denies Herbert's account. In substance, Douglass says that Herbert told him he had a complaint about his relief; that Douglass turned Herbert over to his assistant, one Colonel Rector; that Herbert never mentioned war crimes to Douglass; and that Rector never told Douglass that Herbert had mentioned war crimes to him.

Wallace then confronts Herbert with Douglass's account. Herbert says Douglass's account is not true and that he never saw Rector. Wallace states that "60 Minutes" had contacted Colonel Rector, who said that he had spoken with Herbert "at some length" about his relief from command, but that Herbert "never claimed that war crimes had anything to do with it." Wallace expands on that theme:

"In fact, over the past several months, we have spoken with many men who saw Herbert after his relief in Vietnam. Some are still in the service, some are out. Most of them admire Herbert, yet to a man they say that Herbert never once said to them that he had been relieved because he had tried to push war crimes charges."

Shifting gears somewhat, Wallace asks Herbert if Herbert claims that the Army's investigation into the court-martial charges against Barnes and Franklin was a "whitewash." Herbert makes an affirmative response. Wallace asks Herbert if he remembers an attorney by the name of "Ken Rosenbloom." "Yes, I do," replies Herbert; "I was the one that put you in contact with him." "Right," Wallace responds. The program then moves to an interview between Wallace and Rosenbloom. Wallace identifies Rosenbloom as a former captain in the Judge Advocate General's corps who handled the Barnes investigation, and is now an assistant district attorney on Long Island. (The correct spelling is "Rosenblum," but in this section of the opinion I will use the version in the program transcript.) Rosenbloom in substance denies that the Barnes investigation was a whitewash. He describes travels "all over the country," "thousands and thousands of pages of transcript," and complete open access to information given by the Army. The ultimate verdict was that the charges against Barnes did not hold water; Rosenbloom described himself as open-minded, with no grudge against the Army, no grudge against Herbert, and no Army career to protect.

Rosenbloom fades from the screen, and Wallace again confronts Herbert. Herbert responds: "Then let them present the statements and the evidence." This is a reference to the fact that the Army has never consented to the release of the Barnes and Franklin investigation files. Herbert also says that another military lawyer, one Dick Heintz, "will verify what we have said." Wallace replies that 60

Minutes contacted "Herbert's military lawyer, Captain Heintz." Wallace continues:

"He said that, from the few documents he had seen, he suspected the Army was not doing its best to investigate Herbert's charges. But he said that he could not be at all certain of that until the full investigations are made public."

Wallace moves on to another topic. He says:

"Another thing that we found out checking out Herbert's book: although several men who served with Herbert say it's not so, there are others who claim that Herbert was an officer who could be brutal with captured enemy prisoners himself."

Wallace then turns to Herbert: "You used to have a radioman by the name of Bruce Potter, right?" Herbert acknowledges that he did. The audience then views part of a filmed interview between Potter and Lando. Potter recounts an incident suggesting that Herbert terrorized Vietnamese detainees by making them think he would throw them out of a helicopter. Potter and Lando fade out. Wallace confronts Herbert with the incident. Herbert denies it. Herbert then acknowledges to Wallace that he knew one "Bob Stemmies" (the correct spelling is "Stemme," but I will continue to follow the transcript), a military intelligence sergeant in Vietnam. Wallace advises Herbert that Stemmies had told 60 Minutes that "he was present once with you as a Viet Cong nurse was being interrogated by ARVN troops, being beaten by them to get her to talk, you were there, stood by, did nothing." Herbert denies the incident. Wallace asks Herbert if he remembers a helicopter pilot named Mike Plantz. Herbert says he does not. Wallace tells Herbert that while Plantz was flying a helicopter for Herbert, he saw Herbert beat up a "wood cutter" and also a Viet Cong prisoner brought back to Landing Zone English. Herbert denies that incident: "It's false. It's false."

Wallace then introduces the name of Bill Hill. The following exchange takes place:

"WALLACE: Bill Hill, one of your top company commanders—

"HERBERT: Yes.

"WALLACE: —has told us that Herbert 'is the best battalion commander I've ever had, but for some reason he's become a liar. It's all so much garbage.'

"HERBERT: If he's still in the Army, he will do the same as other officers will do, I'm sure, in order to keep their career going. These men are not going to destroy themselves.

"WALLACE: In other words, he has simply chickened out and is going along with the Army line against Herbert?

"HERBERT: I don't know.

"WALLACE: Well, that's what you're suggesting.

"HERBERT: I don't even know he said it. You're telling me he said it. But I'm sure he did say it if you say he did. I'm telling you, if Bill Hill feels I'm lying, he's entitled to have that opinion, right?"

The program then turns to what one may characterize as the "Grimshaw Confrontation." Wallace introduces the theme: "In checking out Herbert's book, 'Soldier', we found numerous stories that, according to the people mentioned in those stories, are not true." "One such man," Wallace continues, is a Major Jim Grimshaw, who served under Herbert as a company commander in Vietnam. The program pans to Wallace's interview with Grimshaw. Grimshaw denies that he performed a hazardous feat described by Herbert in his book, or that Herbert recommended Grimshaw for the Silver Star for that incident, as Herbert said he did. Wallace asks Grimshaw: "What do you think about Tony Herbert?", tailoring the question to "things of which you have certain knowledge." Grimshaw responds that Herbert "has expanded some of these stories," and that Herbert has "blown it out." Wallace then asks Grimshaw if Grimshaw believes that Herbert was relieved from command "because he wanted to push allegations of war crimes and atrocities." Grimshaw responds in the negative. Wallace reminds Grimshaw that the interview is taking place in the Pentagon, and asks: "Did anybody here order you to come here and talk to us?" "No,"

says Grimshaw. Wallace asks Grimshaw: "You're your own man?" Perhaps not suprisingly, Grimshaw replies: "I'm my own man. I like to think I am. I hope I am."

Wallace then faces the cameras and says this:

"Jim Grimshaw telephoned Colonel Herbert after we had talked to him. Herbert called us with that news and he claimed that Grimshaw told him that he had spoken with us in the Pentagon only under pressure—that his career was on the line. Herbert told us that was the reason that other officers had also come out against him. When we checked with Grimshaw, he denied telling Herbert that. So to settle the argument, we flew Grimshaw and his wife to New York and had them wait outside listening to our interview with Herbert. When Herbert again intimated that Grimshaw had been pressured by the Pentagon to bad-mouth Herbert, we told Herbert that Grimshaw was there."

The program then reverts to Wallace's interview with Herbert. Grimshaw enters, stage right. He and Herbert greet each other. Herbert and Grimshaw, with occasional interjections by Wallace, discuss the accuracy of those incidents in "Soldier" of which Grimshaw has personal knowledge. Grimshaw says: "So, now we're talking three incidents, when you get right down to it," and adds: "I'm telling you two-thirds, then, are not true." Wallace immediately asks Grimshaw if he was under any pressure from the Pentagon or his commanding officer to give Wallace an interview. Grimshaw answers: "No," "Absolutely not," overriding Herbert's statement: "You told me that." "And I wasn't briefed," Grimshaw adds for good measure.

Next, Wallace elicits from Grimshaw an implied criticism that Herbert should have checked out his stories with people whose names appear in the book. Grimshaw says: "Why didn't you call guys like myself or Hill or some of these guys." Herbert expostulates with Grimshaw, but Grimshaw again overrides him:

"GRIMSHAW: You know, you're making us a public figure—
"HERBERT: Okay, wait a minute, Jim.
"GRIMSHAW: —whether you want— You know, you're trying to do me a very good job and, in a sense, maybe I think it's because of all the problems that occurred and you maybe want to put us in a good light to the American public. But now you've made me a public figure. I can't help it; I have to speak out."

Wallace then describes the generally favorable and uncritical publicity that Herbert had received from the media. Attorney Ken Rosenbloom appears again to express the opinion that "because of the temper of the times and what the country wanted to hear, perhaps, or because the media was looking for another hero, they tended to accept these allegations uncritically." Wallace then draws from Franklin the acknowledgment that Franklin refused to talk to the *New York Times* in Vietnam. At this point, Barnes observes that during the court-martial investigations, the Army's policy was not to put out any statements, so that "the press had no place else to go for information but back to Herbert, where the source was. And I just think that the press did what they could but they weren't given both sides of the stories."

The program concludes with the following:

"LANDO: Why not make the investigation public, then?
"BARNES: Don't ask me. If I was in charge I would, but I'm not in charge.
"HERBERT: One of the things I have said from the beginning is that you'll never know for sure. No one will know the whole truth until the Army releases for publication every single document and statement they have, which they have not done unless they've let you read them all. And the second portion [sic] is, until they have a full Congressional inquiry to find out is Herbert telling the truth? Is Herbert lying? Is Ross Franklin telling the truth? Is Ross Franklin lying? And lay it all out there for everybody—and I'm sure that's what

you're trying to do to some extent tonight and I go along with it.

"WALLACE: Okay.

"The Army could indeed help resolve the controversy. They could open their files to a public airing. They could make themselves available for questioning about the whole Herbert business. But they won't. I asked former Army Chief of Staff William Westmoreland to talk about it. He refused to be interviewed. I asked General Winant Sidle, the Army's Public Information Chief. He refused, too. Why? We heard two lines of speculation among Pentagon people. One is that the Army doesn't want to help make a martyr of Tony Herbert. And the other is that during their various investigations into Herbert's charges, the Army found so many true stories of war crimes that, irrespective of whether Tony Herbert had reported any of them, the Army just doesn't want to wash that kind of dirty linen in the open. Perhaps the best way to stop all speculation is to do what you heard Anthony Herbert and General Barnes suggest a moment ago: make the Army investigations public."

Herbert's statement appearing in this concluding exchange was in fact transposed by CBS, in the editing process, from the beginning of Wallace's interview with Herbert to the end.

## VI.

### Genesis of the Article

Shortly after the program was aired, Lando began work on an article. Its purposes, according to Lando, were to describe Lando's investigation of Herbert and the preparation of the program; to counter charges Herbert was making against Lando and the program; and to discuss Herbert's ready acceptance by what Lando regarded as the "liberal" press.

Lando sold his article to defendant Atlantic Monthly. Atlantic editors participated in readying the manuscript for publication. The article appeared in the May 1973 issue of the magazine, under the title "The Herbert Affair."

## VII.

### Contents of the Article

The article runs over nine pages of the magazine. *Atlantic Monthly's* editors composed a preface to Lando's words. That preface, known in the trade as a "streamer," is the first text to appear under the title. It reads as follows:

"He seemed to be the perfect soldier, a hero in Korea and in Vietnam. Then he was driven out of the Army, his career ruined because he tried to prevent his superiors from concealing war crimes against the Vietnamese. That was the story a television producer persuaded his superiors at CBS should be presented to a nationwide audience. As the producer and his associates began assembling the facts, they found it changing into a very different story, one that left the reporter disillusioned and the hero threatened with decanonization. The producer here tells how the case unfolded for him, from his first, convincing interviews with Lieutenant Colonel Anthony Herbert, through intensive researching of Herbert's alarming charges against fellow Army officers, to a dramatic confrontation between Herbert and some of those who disputed him on the CBS program, *Sixty Minutes*, shown on February 4 of this year. It is a tangled story, to say the least. One of its lesser anomalies: Herbert's book *Soldier*, now profitably riding the best-seller list, is published by Holt, Rinehart and Winston, which is owned by CBS, the organization that has done the most to attack the book's integrity."

Lando's text then begins. Lando describes his initial interviews with Herbert, the favorable impression Herbert made upon him, and Lando's belief in Herbert's charges against Barnes, Franklin, and the Army. In July and September 1971, Lando notes in the article, Herbert received favorable write-ups in *Life* magazine and the Sunday magazine section of the *New York*

*Times.* That second piece, Lando notes in his *Atlantic Monthly* article, "was written by the *Times* Southern correspondent James T. Wooten. Wooten had covered Herbert since he first made his charges public, and had come to believe fully in the man and most of his claims."

Lando goes on to recount Herbert's appearance on the Dick Cavett Show, and the increasing publicity that Herbert's charges were receiving in the Congress and in the press. Lando describes the responses to the charges that the Army began to make, following the Army's exoneration of General Barnes in October 1971. "Fueled by such information and interviews provided by the Army," Lando writes, "several reporters began to write pieces seriously questioning Herbert's claims." An excerpt from the transcript from the "60 Minutes" broadcast is quoted, setting forth Franklin's denials of reports or conversations with Herbert about war crimes.

In the article Lando recounts his initial enthusiasm for doing a favorable "60 Minutes" segment on Herbert, and Wallace's initial skepticism. Lando describes his ensuing investigation, interspersed with further quotations from the "60 Minutes" transcript. Lando describes interviews, evidence, and evaluations which ultimately persuaded him that Herbert was not truthful.

Lando is also critical in the article of Herbert's book *Soldier,* describing it as "a melange, a kaleidoscope of truth, half-truth, and fabrication." Lando gives examples of these imperfections, as he perceives them. Lando quotes comments made by S.L.A. Marshall in an article Marshall wrote for the *National Review,* which cast doubt on the accuracy of Herbert's prior account of events in Korea. Lando points to discrepancies he perceives in Herbert's earlier book, *Conquest to Nowhere.*

Lando describes Herbert's third appearance on the Dick Cavett Show in January 1973. Herbert referred to Pentagon documents which he said would prove his case; but, Lando observes, Cavett did not ask Herbert to produce them.

In the article Lando expresses surprise that the firm of Holt, Rinehart and Winston, the publishers of *Soldier* (which Herbert wrote with the assistance of Wooten) did not react or contact CBS in any way after the unfavorable "60 Minutes" segment had been aired. Lando writes that when he was preparing the *Atlantic Monthly* article, he called Holt to inquire about the captions to several photographs in *Soldier* which Lando perceived to be inaccurate. Holt editors and officers are quoted as responding, in substance, that they had not checked out the details, although one Holt editor added: "There is no question in our mind about the substantial validity of Tony's story."

The article concludes:

"What to conclude? I don't pretend to know the motives behind the behavior that has brought Herbert to national prominence. It seems plain to me that they included a desire to salvage his threatened career and to seek revenge on Colonel Franklin and General Barnes, and that to do so he exploited the issue of war crimes.

"The Army has not released the contents of its investigation into the Herbert affair. The Army is not compelled to do so. There is no recent precedent for such disclosure, though it would presumably go a long way toward clearing the air. The Army, however, may well resist publishing the information because it would include many accounts of atrocities that would further damage the Army's own reputation.

"It is important not to let the vagaries of the Herbert affair obscure the fact that atrocities did occur, before Herbert's eyes and the eyes of countless others. Indeed, the argument can be made that Herbert, whatever his distortions and inventions, is to be thanked for keeping the nation's eyes on the war crimes issue. But I am not comfortable with that argument, because it forgets the responsibility of the press. The press, which long had been negligent about dealing with the question of American war crimes, found in Herbert a heroic figure, a martyr through whom to dramatize the is-

sue. But we bought ourselves a martyr with feet of clay."

Atlantic editors had considerable input with respect to the wording of the concluding paragraph of the article. Robert Manning, then editor-in-chief of the magazine, was particularly involved, conferring with Lando about the wording. The magazine's editors were concerned with summing up and clarifying the themes of the article. While the evidence on certain points is in conflict, a jury could reasonably find that Manning was the first to suggest the phrase in the final sentence: "a martyr with feet of clay."

The evidence also shows that at the initiative of Atlantic editors, Lando included in his article the following paragraph:

> "One of the few reviewers to question Herbert's credibility discovered inaccuracies in his account of Korean experiences. S.L.A. Marshall wrote in the *National Review:* 'As for where truth lies in this incident, and the reliability of Mr. Herbert's testament, if his recollection of what happened around Ankhe and Tuyhoa in Vietnam is no better than his recall of experience in Korea, the grading should be zero minus. Having been there at the same time, moving through the same scenes with the same outfits, I say that he dilates expansively on things that never happened.'"

Finally, Atlantic contributed the graphics which accompany the article. These graphics consist of five silhouettes of a helmeted soldier, depicted as if they were targets on a firing range. These illustrations appear on pages 1, 3, 5, 7, and 9 of the article. The last illustration appears underneath the concluding paragraph. As the article progresses, the soldierly silhouette becomes increasingly riddled with bullet holes. There are none in the first illustration; the fifth and last resembles Swiss cheese.

## VIII.

### *"Actual Malice" and Herbert's Claims against Lando, Wallace, and CBS*

It is now time to examine in detail those statements in the program and article which plaintiff claims are actionable: that is, statements plaintiff alleges were false, defamatory, and made with knowledge of actual or probable falsity.

On occasion plaintiff's brief lumps all "defendants" together indiscriminately. But there are significant differences in status. Lando was the prime investigator and architect of the program, and sole author of the article. Wallace did some investigating and contributed to the structure of the program. CBS employed them both. While Atlantic Monthly published Lando's article, it had nothing to do with the program, and did no investigating. Obviously different issues of liability arise. I shall first deal with the charges of actual malice on the part of Lando, Wallace and CBS. Atlantic Monthly will be considered separately.

■ Much of plaintiff's 282-page brief deals with background material: the perceived predisposition of Lando and Wallace to debunk Herbert; the methodology of the investigation; facts omitted, avenues left unexplored, contradictions ignored. All this plays an admissible and potentially useful role in the analysis of a public figure defamation case. But a time comes, in response to summary judgment motions, when the plaintiff must specifically identify those statements which he says were made with knowledge of actual or probable falsity. He cannot rely on the allegations of his complaint, even those allegations which purport to identify specific false and malicious statements. The legal sufficiency of that pleading brought the defendants into court and required them to answer. Since joinder of issue on the pleadings extensive discovery has been conducted. At the end of that discovery, defendants move for summary judgment. They say, in essence, that some of the contents of the program and article are not defamatory; none of them are false; and in any event no statement was generated by actual malice. Elaborate affidavits and briefs are offered in support of these propositions. In re-

sponding, plaintiff must abide by Rule 56(e), F.R.Civ.P.: he "may not rest upon the mere allegations ... of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

I dwell on these obvious truths at some length because it is not until page 224 of plaintiff's brief that one finds a list of particular, identified statements which plaintiff claims were "false statements known by defendants to be false." There are eleven of them. It is these statements—and these alone—which plaintiff, exhaustive discovery having been accomplished, now puts forward in opposition to summary judgment. In musical terms, what went before is recitative. The aria begins on page 224 of the score.

 I will analyze these eleven statements in turn. But I must first consider a footnote which plaintiff drops from the introductory paragraph of his text at p. 224. That footnote reads:

"In regard to these statements a jury could find defendants did know they were false when published (*see Herbert v. Lando,* 73 F.R.D. at 393). In regard to many other statements the jury could find defendants were aware of their probable falsity (*cf. Gertz,* 418 U.S. at 334, n. 6 [94 S.Ct. at 3004 n. 6]). Because of the overwhelming evidence of defendants' awareness on some of these other statements, plaintiff contends such evidence may also properly support a jury finding of knowledge of falsity. Such other statements are not listed herein, nor has the defamatory impact of the publications in their entirety been addressed here. Also not included herein are published statements of fact which defendants did not know to be the fact (*see, e.g., supra,* pp. 153–156). The making of such statements falls within the area of reckless disregard. *See, Sills v. New York Times,* 8 Med.L.Rptr. at 1463."

With due respect to plaintiff's experienced counsel, I am at a loss to understand what defendants and the Court are to make of such contentions. The assertion that "[i]n regard to many other statements the jury could find defendants were aware of their probable falsity," standing alone, is no more than bare conclusion. If plaintiff does not specifically identify such statements—and he declines to do so—how are the defendants to reply? In fact, defendants do not respond to this footnote in their reply papers, and one can hardly blame them. Surely defendants are not required to suggest which of their own statements a jury might regard as reckless. And the Court is not about to speculate on the subject.

No. Plaintiff's clear obligation in response to these motions was to identify specifically those statements which he contends a jury could find actionable under the *New York Times v. Sullivan* rule, under either prong of the "actual malice" definition. He undertakes to do so in the eleven instances to which I now turn. I consider no other statements.

In the ensuing sub-sections, I first quote the statement and criticism as set forth in plaintiff's brief, and then analyze the record evidence. The question for decision is whether the particular statement is *actionable,* by which I mean susceptible of imposing liability at the hands of a reasonable jury properly instructed on the law.

---

(a) On the program, in answer to Lando's question to Barnes whether "Herbert ever formally or informally reported any war crimes or atrocities" to him, Barnes stated, "He himself never did to me. Absolutely not." Lando knew, however, that Herbert had reported POW mistreatment at the An Khe compound to Barnes through his XO, Bethea, who immediately conveyed the information to Barnes.

 I accept plaintiff's implicit proposition that if the CBS defendants broadcast Barnes's statement knowing that it was

false or probably false, they would be liable even though Barnes uttered the words. But this statement cannot operate as a vehicle for liability because it does not satisfy the threshold requirement of falsity.

The clear thrust of Barnes's statement is that Herbert never *personally* reported war crimes or atrocities to him. The full exchange follows:

"LANDO: Did Colonel Herbert ever formally or informally report any war crimes or atrocities to you?

"BARNES: He *himself* never did to me. Absolutely not. If he had, I would have taken the same action I did when I learned of atrocities anywhere. If they are under my responsibility, I would have court-martialed the man responsible for it, as I told every replacement that came into the brigade." (emphasis added).

The existence *vel non* of personal reports by Herbert to Barnes or Franklin was significant because of the strong *ad hominem* attacks made by Herbert upon his two superior officers in *Soldier* and his statements to the media. Pursuing this theme, the program turned immediately from Barnes's denial to a comparable denial by Franklin that Herbert had ever reported war crimes or atrocities to *him*.

Plaintiff says Lando knew Barnes's statement was false because Lando knew "that Herbert had reported POW mistreatment at the An Khe compound to Barnes through his XO [executive officer], Bethea, who immediately conveyed the information to Barnes." But reporting personally to one officer is not the same as reporting personally to another. The element of falsity is lacking. That conclusion is reinforced by Herbert's sworn testimony on November 4, 1970 to an Army CID agent (Eldridge Reply Affidavit, Ex. A):

"MR. SNYDER [CID agent]: Did you ever personally report any of the aforementioned incidents to BG BARNES, CG, 173d Airborne Brigade?

"LTC HERBERT: No. General BARNES made it known that all reporting would be done through Colonel FRANKLIN, if they were tactical and through the XO, whom he described as 'Chief of Staff', for administrative matters."

On the threshold issue of falsity, Herbert's CID testimony is inconsistent with his litigation position that Barnes's statement— "he [Herbert] himself never did [i.e., reported] to me"—was false.

But even if I were to regard Herbert's report to Bethea as the functional equivalent of a report to Barnes, thereby branding Barnes's statement as false, there is no genuine issue on actual malice.

According to Herbert, the incident in question occurred in early January 1969. Herbert was acting Inspector General ("IG") of the brigade. While at Fort McPherson on November 5, 1970, Herbert gave a statement to the Army CID. He alleged that a master sergeant Booth, assigned to his IG section at An Khe, reported to Herbert that he had witnessed the maltreatment of Vietnamese detainees at a compound by military police. Herbert says he went to the compound, ordered the military police to desist, and called Lt. Colonel John D. Bethea, the brigade executive officer, at brigade headquarters at Bong Son to report the incident. Herbert said Bethea ordered him to come to headquarters. Herbert did so. He handed his notes of the incident to Bethea, and recommended to Bethea that a full scale investigation be made. Herbert's CID statement then says:

"He told me to wait and he would discuss it with General BARNES. I waited outside of the General's aide's office. I saw BETHEA walk off toward the General's trailer located about 50 yards away. I did not see him enter the trailer. About 5–10 minutes later BETHEA returned and he told me that I would not conduct an IG investigation that an investigation would be conducted through other than IG channels—and it was no longer my concern."

The CID file (Lubell affidavit, Ex. G) also contains an undated, unsigned statement from Bethea which plaintiff's brief (at 93) says Bethea "refused to sign on advice of

counsel." Bethea's statement corroborates Herbert's telephoned and personal reports to him concerning the An Khe incident, and adds: "I consulted with General BARNES, CG, 173d Abn Bde, concerning the allegation of maltreatment of An Khe and he approved my recommendation of having the matter investigated by an investigations officer." Plaintiff accordingly argues that Bethea, in that statement at least, supported Herbert's claim that Barnes learned of Herbert's An Khe report through Bethea.

However, this material was not available to Lando at the time of the program. It is common ground that the Army CID investigation files were not released by the Army until plaintiff and the CBS defendants forced their partial disclosure in Freedom of Information Act ("FOIA") litigation during pendency of the case at bar. Lubell affidavit at ¶ 40, p. 30. There is no evidence Lando had this information available to him at the time of the program, or the article. Herbert's book *Soldier* did mention Bethea in connection with unrelated incidents, and Lando personally interviewed Bethea about them. But Lando's notes of the interview (PX 109) contain no indication that the An Khe reporting incident was known to Lando or commented upon by Bethea.

There is no basis in the record for a finding of actual malice in respect of Barnes's statement. Accordingly it is not actionable.

---

(b) On the program and in the article, in answer to Wallace's questions, Franklin stated that Herbert "never" reported war crimes or atrocities of any nature to him "In no way, either orally or in writing. I had many conversations with Colonel Herbert, we discussed many things but never war crimes." Lando knew, however, that Herbert had discussed the An Khe mistreatment with Franklin and that Franklin conceded Herbert "possibly" discussed with him mistreatment of the Vietnamese by American advisors and ARVN forces.

The discussion in plaintiff's brief about Lando's indicated knowledge (pp. 94–95) shows that the source of that knowledge was testimony Franklin gave at the hearing into Herbert's war crime charges against Barnes. As noted *supra,* this testimony was not available to Lando when he researched and prepared the program, although he had attempted to obtain such material from the Army. Obviously Franklin's testimony at the Barnes investigation is irrelevant to the state of Lando's mind at the time of the program. Plaintiff does not point to any evidence suggesting an earlier acquisition of this information by Lando.

Furthermore, Franklin's account of the An Khe incident at the Barnes hearing was that Herbert recounted to him "something he had seen that was bad." Lubell affidavit, Ex. F, Franklin at 7389. The incident as recalled by Franklin in his testimony involved "MPs ... putting U.S. Soldiers in a front leaning-rest position." *Id.* at 7389–7390. Even if the Barnes file had been available to Lando—and it was not—there is no evidence that the discussion rose to the level of a report by Herbert to Franklin of a "war crime" or "atrocity." On the contrary: Herbert's detailed charge sheet against Franklin, executed at Fort McPherson on March 15, 1971, which lists Franklin's failures to report or investigate a series of war crimes, makes no mention of the An Khe incident.

There is no proof of actual malice at the time of publication of Franklin's statement in the program or the article. This statement is not actionable.

---

(c) Wallace stated, "Several men serving under Herbert said they had heard Herbert say, while in Vietnam, that he had reported the February 14 killings, but none were certain that he had actually reported them." In fact, both Lando and Wallace knew that (1) not several, but many men while in Vietnam heard Herbert say he had reported the Cu Loi killings; (2) many men heard, in addition, Herbert's warnings that war crimes and

atrocities, like Cu Loi, were absolutely prohibited; (3) several men had not only heard Herbert say he had reported the February 14 murders but several men *themselves* heard or saw Herbert reporting the killings. (emphasis in original).

 Wallace made the quoted statement at the time when the program was focusing upon whether or not Herbert personally reported the Cu Loi incident to Franklin in Vietnam on February 14. Just before making the quoted statement, Wallace had confronted Herbert with Franklin's check to the Ilikai Hotel in Hawaii, dated February 14. Herbert responds to that document; and Wallace then makes a series of comments from which the statement presently under consideration is taken. I quote that exchange, emphasizing the words which Herbert contends contain a knowing false statement of fact:

"HERBERT: I can probably find you a hundred checks that I have either dated for another reason, wrote after the fact, misdated, what have you. I don't know. All I know is I saw Ross Franklin there and talked to him. I know that. I know what I saw. I know what I did. And I stick by it and I still say it. And I swear to it and I've sworn to it under oath and I'll swear to it again, you know?

"WALLACE: In his book, Colonel Herbert writes that there are several people who can testify that Franklin was in Vietnam on February the 14th. We asked Herbert for the names of those men. We contacted almost every one of them. None could confirm Herbert's claim. *Several men serving under Herbert said they had heard Herbert say, while in Vietnam, that he had reported the February 14 killings, but none were certain that he had actually reported them.*"

Plaintiff's brief characterizes the italicized statement as knowingly false on three grounds, which I will consider in turn.

First, it is said that both Lando and Wallace knew that "not several, but many men while in Vietnam heard Herbert say he had reported the Cu Loi killings." This criti-cism turns on the distinction between "several" (Wallace's word) and "many" (the word preferred by Herbert). The distinction between "several" and "many" has both objective and subjective overtones. A journalist who states that "several" people attended a track meet could be fairly charged with false reporting if he knew that 100,000 fans had filled the stadium. On the other hand, several minutes listening to Beethoven may feel like many minutes in the dentist's chair. Plaintiff's brief (pp. 37–53) discusses the individuals he has in mind in criticizing Wallace's choice of word. In this particular context, I conclude that plaintiff's criticism is nothing more than a quibble.

Secondly, plaintiff argues that both Lando and Wallace knew that "many men heard, in addition, Herbert's warnings that war crimes and atrocities, like Cu Loi, were absolutely prohibited." The difficulty with this criticism is that it has nothing to do with the subject matter of Wallace's statement. The pertinent portion of the program addressed whether or not Herbert had "actually reported" war crimes or atrocities to his superior officers. Herbert's warnings to his men that war crimes and atrocities were prohibited does not bear on that issue at all.

Finally, plaintiff argues that both Lando and Wallace knew that "several men had not only heard Herbert say he had reported the February 14 murders but several men *themselves* heard or saw Herbert reporting the killings." (emphasis in original). The last phrase of this criticism at least focuses upon the issue raised by Wallace's statement.

The discussion in plaintiff's brief of the pertinent evidence (pp. 37–53) lays stress upon six individuals. I will first consider their evidence, and then the effect of that evidence upon the issue of actual malice.

The first is Sgt. Wallace W. Warden, who at the time of the Cu Loi incident was platoon sergeant of the 1st Platoon of B Company in Herbert's battalion. Lando interviewed Warden at Ft. Benning, Georgia in December, 1972. Warden has submitted

an affidavit in opposition to the present motions. In that affidavit he describes his interview by Lando. Lando showed Warden selected portions of Herbert's book *Soldier* and asked Warden if the accounts were accurate. Warden cannot presently remember all the portions Lando asked him about, but he said they were accurate. But Warden does recall that Lando asked him specifically about the incident at Cu Loi. In his present affidavit, Warden says that he described to Lando the capture by his platoon of a number of prisoners. Warden's intent was to take the prisoners back to base. However, South Vietnamese troops arrived, accompanied by an American lieutenant advisor. They took over control of the prisoners, whereupon the South Vietnamese began shooting the prisoners. Warden describes himself as running to tell Herbert about it, Herbert being "about 3 or 4 minutes behind our platoon." Affidavit at 2. Herbert was very angry, came to the clearing, "screamed at the [American] lieutenant," and told him he wanted no more killing. Warden's affidavit then says:

"He [Herbert] told me to go to the rear and get the remaining people out of the area and be sure nothing happened to them. He said he was going to call on the radio and he went to the radio and did so. I told Mr. Lando that he was very mad when he went to call on the radio."

Plaintiff's brief (at 39) also refers to a statement given by Warden in November 1970 to the CID that Herbert had seen the four male prisoners on the ground and "he got on the radio and called somebody and reported the incident." That, of course, is a version more helpful to plaintiff on the present issue than what Warden says in his affidavit he told Lando in December of 1972. But it is common ground that Warden's CID statement, AHX 94, was not available to Lando at the time of the program or article, having been obtained by Herbert through FOIA proceedings. Herbert deposition at 2394–95.

The second individual is Larry W. Kahila. Kahila served as a helicopter pilot with the brigade during the pertinent time. He has given an affidavit in opposition to defendants' motion.

In that affidavit Kahila states that during the Cu Loi action, Herbert had three helicopters working with him, one piloted by Kahila. Kahila says that he flew Herbert into the Cu Loi area. Herbert landed, and Kahila flew above the action. After flying around for a time, Kahila landed his aircraft and, according to the affidavit (¶ 3, p. 2), "Colonel Herbert boarded and immediately got on the radio." The affidavit continues:

"I know he was talking to someone at Brigade Headquarters. The radio net was set for Brigade communication. I monitored the beginning of the call and I believe he was talking to Colonel Franklin because he used Colonel Franklin's call sign when he got on the radio. While I can no longer recall at this time what Colonel Franklin's call signal was, I do specifically recall Colonel Herbert using Colonel Franklin's call signal. From what I could hear at the beginning of the conversation, the voice that Colonel Herbert was talking to sounded to me like that of Colonel Franklin. Shortly after Colonel Herbert started to talk, I had to switch off to another net. When Colonel Herbert got on the helicopter and when he was speaking on the radio to the person I believe to have been Colonel Franklin, he was very upset and angry about something that had happened to the prisoners. He ordered me to get him back to Brigade Headquarters as quickly as possible."

Kahila's affidavit also states that as soon as he landed the helicopter at the landing pad at brigade headquarters, "Colonel Herbert jumped out and hurried off to the brigade headquarters building."

Lando interviewed Kahila several times by telephone. In Kahila's affidavit (¶ 10, pp. 6–7), Kahila gives this account of those interviews:

"10. In 1972 and early 1973, I recall speaking to somebody who identified himself as Barry Lando on what I believe are three occasions. All of these discussions were by telephone. I specifically recall telling Mr. Lando that I heard Colonel Herbert call back to Brigade Headquarters on February 14th, that Colonel Herbert was very upset at that time, and that from what I personally heard of the conversation and his use of Colonel Franklin's call sign, I firmly believed Colonel Herbert was speaking to Colonel Franklin. I also told Mr. Lando about Herbert's comments on the helicopter while heading back to Brigade Headquarters, about getting it straightened out and 'that they could not do that.' I further told Mr. Lando that I left Colonel Herbert off at the Brigade landing pad, that the pilots had subsequently discussed the killings at the mess hall, that Herbert had told people that it was a crime, that it was common knowledge that prisoners had been killed at Cu Loi, and that Colonel Herbert, who was very upset over it, was trying to have something done about it. I also told Mr. Lando about the conversation that Colonel Herbert had with me when he was relieved from command. I further recall telling Mr. Lando that Colonel Herbert said his relief was part of Army politicking resulting from his reporting the Cu Loi killings and Brigade's view that what to do about it had become a problem. While I cannot be certain in which particular conversation I told Mr. Lando of these matters, I specifically remember telling him these things and I believe I mentioned some of them on more than one occasion. I am certain that I mentioned to Mr. Lando my belief that Colonel Herbert spoke to Colonel Franklin on the helicopter radio on February 14 more than once."

The CBS defendants in their reply papers attack the credibility of Kahila's affidavit account of what he told Lando. They base that attack upon seemingly inconsistent prior statements Kahila made to Charles Morgan, Herbert's civil rights lawyer, and upon Lando's handwritten notes of his own interviews with Kahila. Lando discusses Kahila in his affidavit at ¶ 17, pp. 7–8:

"When I had visited Herbert in Atlanta in March, I had listened to and made notes from audio tapes of telephone conversations Herbert and Morgan had with men concerning the St. Valentine's Day Massacre (*ante* par. 9). One of these men, Larry Kahila, was Herbert's helicopter pilot on February 14, 1969. Herbert told me, and it was my initial impression from listening to the Kahila tape, that Kahila had overheard Herbert report the killings from his helicopter on the radio on February 14. But after rereading my notes and interviewing Kahila myself, I realized Kahila had not heard the radio call and had no firsthand knowledge. Although he told me that he thought that Herbert had reported the killings, his belief was based upon the fact that he had observed Herbert speaking on the radio on February 14 and that Herbert had subsequently told Kahila he had reported the killings." (footnote omitted).

While challenges to Kahila's credibility would be proper grist for defendants' mill at a trial, I am hardly in a position to hold that a jury could not accept the account of his interviews with Lando that Kahila gives in his affidavit. Defendants' entitlement to summary judgment must therefore turn upon other considerations.

The next individual mentioned in plaintiff's brief (at 41) is Laurence A. Potter. Potter was a lieutenant in the Army Medical Services Corps, assigned to the 173d Airborne Brigade. Potter knew Herbert. He has submitted an affidavit in opposition to the motions. Potter also gave the CID a written statement on November 21, 1970. That statement was not available to defendants at the time of the broadcast. The CID statement describes an incident which resembles Cu Loi. Potter described witnessing Herbert preventing a "National Police Field Force Unit from shooting some VC prisoners" and Herbert taking control of the prisoners and sending them to Land-

ing Zone English under the control of American troops. Potter was also in a position to testify to Herbert's adverse reaction to the Cu Loi killings and his opposition to prisoner mistreatment. Potter was never interviewed by Lando. It is apparent that he was not in a position to testify concerning the particular point at issue, namely, certain knowledge that Herbert had reported the Cu Loi incident to his superior officers.

The next individual is Capt. Bill Hill. Hill was one of Herbert's company commanders. Lando interviewed him by telephone in March 1972, taping the conversation. PX 4. By that time, Hill had given statements to the CID. Hill was not personally present at Cu Loi; he monitored the action on his radio. Hill told Lando that: "I'm almost positive I heard a radio transmission" to Franklin. Hill added: "You know, I don't know what he was ... I only heard the one side. I heard Col. Herbert reporting it." Lando asks: "To somebody higher up?" The following then transpires:

"A. Yes. And you know the next higher commander is either Gen. Barnes or Col. Franklin.

"Q. So it had to be one of the two.

"A. Yes.

"Q. Would this be talking about the killing of the prisoners?

"A. Yes."

Later in the interview Hill says: "I said I heard it reported to ... you know, being reported. I couldn't say who it was to."

Several days later Lando spoke to Hill again by telephone. Lando deposition at Tr. 1957. He took notes of that conversation. PX 21. According to those notes, Hill said among other things: "Not sure that Franklin was there on 14th," and: "Did hear Tony on radio on reporting superior, doesn't now remember what my statement said/it was not in statement." Lando's reading of his notes at his deposition, Tr. 249.

These initial contacts with Hill led Lando to write a memorandum to Wallace dated March 19, 1972 (PX 10). The introductory paragraphs reflect skepticism on Lando's part with respect to the Army's denials of Herbert's charges. The memorandum continues:

"2. The main atrocity Herbert reported was the killing of four Vietnamese POW's and the slitting one of their-a woman's—throat. The army admits that most of this—except for the woman— took place. But they say that Col. Franklin denies having had it reported to him, and that he was in Hawaii, in any case at the time—February 14, 1969. "Over the past week I have talked with officers who say that 1. Franklin was back in Viet Nam, not in Hawaii when that took place; 2. they heard Herbert reporting the case by radio to 'a superior' 3. that the incident was common knowledge throughout the unit. 4. It was also common knowledge that Herbert was trying to get something done about it.

"There are at least two or three instances where Franklin lied during hearings relating to Herbert's appeal; officers also say that Franklin on at least a couple of occasions tried to discredit Herbert, challenging his body counts, trying to get officers under him to challenge Herbert's accounts. Franklin was also suddenly relieved himself from command in Sept. 1970.

"One problem is that the key officer in all of this—who saw Franklin arrive back at his base, and also heard Herbert report in—has been willing to talk to me in confidence—but would not surface publicly. He is afraid. He says he would tell all this under oath in a court room, or pre-trial hearing with lawyer in attendance. He claims he did tell at least some of it to army investigators.

"That kind of evidence alone would seem to be more than enough to move such a case into at least a full pre-trial preceding [sic]. The army never did. Why? They also never questioned another former chopper pilot who says Herbert told him he was going to report the case to Franklin, then got on the chopper radio.

(He never heard the transmission). But, again, this man was not even questioned by the army."

The "key officer" referred to in the fourth quoted paragraph is Hill. Pursuing his inquiries, Lando interviewed Hill in Oklahoma on December 5, 1972. His notes of that interview are PX 138. Lando showed Hill copies of Herbert's book and asked him to comment. Lando's notes quote Hill: "As best I know H reported it. At least on battalion net I heard someone."

In a later conversation on March 16, 1973 (see notes, PX 143), Hill said of Franklin: "I didn't say I saw him there. I said I thought he was there. Hell I thought he was, but there was no way to be certain, always running around see him every few days. When I sat down to think about it I couldn't be certain."

In his affidavit at ¶ 18, Lando deals with his interviews with Hill as follows:

"In early March 1972, Herbert and I had spoken by telephone to Capt. Bill Hill, one of Herbert's company commanders. It was my first impression that Hill was certain Franklin was in Vietnam on February 14 and that Herbert had reported the killings by radio to either Franklin or Barnes on that day. When I called Hill later that month he stated he was not sure Franklin was in Vietnam on February 14, although he still thought that he had heard Herbert report the killings over the radio that day. I told Herbert what Hill had said. Herbert said Hill's uncertainty was rooted in his desire to protect his military career. In July 1972 Herbert told me that Hill had told him he recalled seeing Franklin with a particular Brigade officer on February 14 in Vietnam. After receiving the book in galley form (*ante* par. 14), I called Hill to check out some of Herbert's claims. Hill agreed to see me and I flew to Oklahoma in December to interview him. Hill stated in this and subsequent interviews that neither the Army nor his concern for his military career had influenced his recollection of the events of February 14, 1969. Hill just could not be sure that

Herbert had reported to Franklin on February 14. Although he had heard someone mention the killings on the radio, he could not be sure that what he had heard was a report to Brigade headquarters nor could he be sure that the person he heard on the radio was Herbert at all. Hill also denied Herbert's story about his having seen Franklin with a Brigade officer on February 14."

Hill has submitted an affidavit in support of defendants' motion. He states at ¶ 5: "Regarding the February 14, 1969 incident at Cu Loi, as I told the CID, I did not take part in that operation. I do recall hearing someone say on the radio on February 14, 1969, 'The white mice * are killing them on the beach', or words to that effect. I do not know on what net I heard this, nor did I hear any response to this radio report. The transcript of my telephone conversation with Herbert and Barry Lando, which conversation took place in or around March, 1972, gives the impression that 1) I definitely heard Herbert reporting the killings to either Col. J. Ross Franklin or Gen. John W. Barnes on the radio on February 14, 1969; and 2) I was sure Franklin was in Vietnam on February 14, 1969. That impression is incorrect. As I pointed out to Barry Lando during my conversations with him in March and December 1972 and January 1973, there was no way I could be certain that: 1) it was Herbert reporting on the radio on February 14, 1969 and that the radio report was to Franklin or Barnes; and 2) Franklin was in fact in Vietnam on that date.

---

" * I understood the term 'white mice' to mean the Vietnamese National Police."

Plaintiff next discusses a series of statements made by Major Jack Donovan. Donovan was Herbert's battalion intelligence officer. Lando interviewed Donovan in Saigon in January 1973, one month before the program was aired. Lando's affidavit (¶ 21 at p. 10) describes that interview:

"In a background interview with CBS in Saigon in January 1973, Donovan empha-

sized that Herbert was a ruthless individual who would not hesitate to lie to preserve his own reputation. He cited Herbert's version of the killings at Cu Loi as an example of this. According to Donovan, Herbert did not mention any 'atrocities' at Cu Loi until several days after the incident and then only when his body counts were called into question. Donovan also told us that to his knowledge no atrocity report was ever filed. Although Donovan would not consent to a filmed interview, he directed us to his statements which were on file with the Army."

These statements were ones which Donovan gave to the CID. Unlike most of the CID files, Lando was able to obtain Donovan's statements before the program was broadcast. They are in evidence at PX 82, 83 and 84. Read cumulatively, they are bewildering.

Donovan gave his first statement to a CID investigator on December 9, 1970. He stated succinctly that he had no actual knowledge of any war crimes committed during his service in Vietnam, including "mistreatment of detainees"; and that he had never received any information concerning war crimes "from any source that I consider reliable, therefore, I have no hearsay information concerning war crimes to report." PX 82.

A different CID investigator interviewed Donovan on May 16, 1971. On that occasion, Donovan signed a statement (PX 83) which describes Herbert reporting to him the details of the Cu Loi incident immediately after it happened. Herbert and Donovan then went to brigade headquarters. Donovan stated to the CID investigator on May 16, 1971:

"I do know for certain that LTC HERBERT reported the killing of the six detainees (or approximately six detainees) to COL FRANKLIN but I do not recall if HERBERT reported the incident to FRANKLIN immediately following the combat action. At that time, I was in Brigade Headquarters with LTC HERBERT checking on intelligence informa-

tion. I was standing about five feet from the location where FRANKLIN and HERBERT were talking when I heard HERBERT tell FRANKLIN about the detainees being lined up and shot by Vietnamese forces. I do not recall HERBERT making mention (illegible). HERBERT was talking directly to FRANKLIN and, in my opinion, FRANKLIN could not help but hear what HERBERT had said. I do not recall FRANKLIN'S response if, in fact, he made a response or reply to the allegation. The information relative to the detainees was part of a continuing conversation between the two and I did not hear a response from FRANKLIN. This conversation took place following the incident, but I cannot say when or how long after the action. Roughly, I would say it was no longer than a month following the action."

This statement, predictably enough, triggered a third interview between the CID and Major Donovan. On June 23, 1971 a third CID investigator asked Donovan to explain the "apparent contradiction" between the two prior statements: the first saying that Donovan had neither seen nor heard of, *inter alia*, mistreatment of detainees, and the second giving full details with respect to Herbert's report of the Cu Loi killings to Franklin. Donovan thereupon launched into an elaborate explanation and "clarification." Donovan stressed that the conversation he overheard occurred some time after the Cu Loi action. He then says this:

"The circumstances being that I was at Bdc HQ with LTC HERBERT and LTC HERBERT had entered the S-3 office and I had passed the office and entered the TOC radio complex and was standing 5-10 feet from the wall separating the S-3 office and the TOC. I overheard a conversation taking place between LTC HERBERT and an individual I thought at that time to be COL FRANKLIN. At no time did I hear the individual make any specific statement but just based upon the sound of his voice I deduced it was COL FRANKLIN in the office, although I never specifically saw the indi-

vidual and only heard a limited amount of the conversation. I was never told by LTC HERBERT that he talked to COL FRANKLIN at that particular time. What I did hear was LTC HERBERT making remarks to the individual about persons being shot on the beach by the National Police at Cu Loi. Prior to this trip to Bdc, LTC HERBERT had been talking extensively about Cu Loi and that people were lined up and killed and that a war crime had been committed. During this particular conversation with the individual, the way in which LTC HERBERT related the individuals being shot was in a form that seemed to me to have been reasonably clear that there was a war crime in a sense that people were lined up and shot, but this was largely due to the fact that I heard LTC HERBERT mention it on several occasions. Thinking back, LTC HERBERT did not make it abundantly clear he was reporting a war crime, but in fact seemed to be a reiteration by LTC HERBERT of the facts concerning the accuracy of his body counts and weapons captured. Prior to this trip, LTC HERBERT'S word was apparently being disputed by Bde concerning the exact results of this contact at Cu Loi. In particular, the advisors to the National Police had disclaimed any weapons being captured and that the body count was exaggerated. In my opinion, the conversation was more of a justification of his report concerning the action at Cu Loi rather than the specific intent of conveying that a war crime had been committed."

This effusion prompted a series of questions by the CID investigator, the first two of which I quote, together with Donovan's answers:

"Q. In your statement of 16 May 71, you indicate that you did not recall the individual's response to LTC HERBERT'S remarks. Did you actually hear anything said by the individual to whom HERBERT was talking?

"A: I heard no specific words that were said by the individual that LTC HERBERT was talking to other than single word acknowledgements of LTC HERBERT'S remarks. The tone of LTC HERBERT'S voice and the manner in general, in which he was speaking seemed typical of most of the conversations he had with COL FRANKLIN. Although I did not pick out any particular words the individual said, and I was in a radio room, it was my impression that this was the sound of COL FRANKLIN'S voice. At no time did I hear any words spoken by the individual in response to statements LTC HERBERT was making.

"Q: Could LTC HERBERT have been talking to someone other than COL FRANKLIN, or are you certain he was talking to FRANKLIN?

"A: No, I cannot be absolutely certain that it was COL FRANKLIN. The tone of the conversation seemed to indicate to me that it was COL FRANKLIN in the office. I cannot rule out the possibility that LTC HERBERT was reporting a war crime to COL FRANKLIN. The portion I heard was very brief, and I was not devoting my complete attention to the conversation. Since I cannot say what came before or after what I heard, I cannot say that LTC HERBERT was not making a full report to COL FRANKLIN."

One can almost visualize the CID investigator shaking his head and taking a deep breath. He tried once more:

"Q: Would you elaborate on why the information concerning the Cu Loi incident is stated much more positively in your statement of 16 May 71 than stated during this interview?

"A. The information I gave in the initial statement was basically true as I believe it to be; however, it did convey a higher degree of certainty than did, in fact, exist. During my interview with the CID agent, this particular area was not probed very deeply and as a consequence there was not sufficient elaboration to place the facts in proper perspective."

The last utterance from Major Donovan in the record is the affidavit he gave to defendants' counsel, submitted in support of the present motions. Donovan's "clarification" consists of denials which are as inconsistent with the second of his three CID statements (PX 83) as was the third of those statements (PX 84).

Of course, all Lando had available prior to the broadcast was his interview with Hill, and the three CID statements. Lando says in his affidavit (¶ 21 at p. 11) that those three statements "taken together were contradictory, vague and ambiguous as to what [Donovan] overheard and to whom Herbert was speaking." That is in my judgment a fair enough assessment. Lando's affidavit describes what he did next:

> "Nonetheless, I confronted Col. Franklin with Donovan's statements. Franklin reiterated that Herbert never mentioned any killings at Cu Loi to him at any time and pointed out the internal inconsistencies in Donovan's statements. I also questioned Kenneth Rosenblum about the Donovan statements. Rosenblum, a former Army prosecutor who worked on the investigation of Herbert's charges against Gen. Barnes, said that when Donovan was questioned during the investigation he disclaimed overhearing Herbert report the Cu Loi shootings to Franklin. Based· upon what Franklin and Rosenblum had told me, the Donovan interview with CBS, as well as my own reading of the statements, I concluded that Donovan's statements were not probative of whether Herbert had reported the St. Valentine's Day Massacre to Franklin."

Finally, plaintiff's brief (at 48–50) describes a conversation which Lando had, after the broadcast but before sending his manuscript to *Atlantic Monthly* with Lt. Col. Ernest Webb. Webb was at the pertinent times the battalion operations officer. Webb told Lando that within 24 hours of the Cu Loi killings, Herbert and Webb told a Major Accousti, a brigade staff officer, about them at brigade headquarters. Of course, in view of the timing of Lando's conversation with Webb, plaintiff's criticism is limited to the article. Plaintiff claims that Lando should have referred to Webb's statement in the article.

The question that arises is whether a reasonable jury could find, upon clear and convincing evidence, that the quoted statement was false, defamatory, and made with actual malice.

The portion of Wallace's statement under attack, in respect of men who had served in Vietnam with Herbert, is: "but none were certain that he had actually reported [the February 14 killings]." "None" means "no one; not one; nobody." *American Heritage Dictionary of the English Language* (1976) at 892. "Certain" means, in the present context: "Established beyond doubt or question; indisputable; confident; assured; positive." *Id.* at 220. The *American Heritage Dictionary* adds this note on usage:

> "*Certain* (adjective) is often preceded by *more* or *most* or terms such as *fairly* and *reasonably*, even though by definition *certain* is seemingly absolute in most of its senses. The following typical example is acceptable on all levels to 83 per cent of the Usage Panel: *Nothing is more certain than an extremist's hatred of compromise.*" *Ibid.* (emphasis in original).

It follows from these accepted meanings that if Lando or Wallace were aware of one—just one—individual who was certain in his mind that Herbert had personally reported the Cu Loi killings to Franklin, either on the day of the action or subsequently, the quoted statement would be actionable. It is the existence of such knowledge on the part of Lando and Wallace that plaintiff alleges in his brief, when he argues that "Lando and Wallace knew that ... several men *themselves* heard or saw Herbert reporting the killings."

Does the evidence bear out this assertion? We may put aside at once the statements of Warden and Laurence Potter that were available to the CBS defendants at the time of the program. (Warden's state-

ment to the CID must be disregarded on the ground of nonavailability.) The closest Warden's affidavit comes to the issue is this statement: "I told Mr. Lando that he [Herbert] was very mad when he went to call on the radio." This does not bear directly upon what Herbert said or who he said it to. As for Potter, his proffered testimony does not touch on the issue at all.

Within the context of the program, we are thus left with Kahila, Hill and Donovan. In Hill and Donovan, we are confronted with Army officers whose initial statements were relatively helpful to Herbert on the issue, but whose subsequent utterances, proffered as "clarification," represented substantial retreats, backtrackings, and changes. Nor, at least in the case of Donovan, can Lando be fairly accused of leading the witness or failing to report accurately what he said. Donovan's reversal of field in respect of the Cu Loi incident appears from his three earlier CID statements which, while available to Lando before the broadcast, had not been influenced by him in any way.

One may plausibly argue—indeed, Herbert does so—that Hill and Donovan told the truth the first time, and then changed their stories because of Army pressure or concern for their careers. But there is no evidence that Lando knew this to be so. The fact of the matter is that Hill's and Donovan's more recent statements introduced elements of ambiguity and uncertainty into narratives which, in their earlier forms, were more positive. Lando could not disregard these professed uncertainties, even though one might doubt that they were genuine. That is to say: Lando could say in the program that Hill and Donovan were "certain" that Herbert had reported the Cu Loi killings to Franklin or Barnes only if Lando accepted what the witnesses had first said, and disbelieved their more recent utterances. But there was no obligation in law or fact for Lando to make that evaluation. Indeed, had Lando ascribed such certainty to Hill or Donovan in the light of those witnesses' recantations, he could have faced an action for

false statement by them. In short: a reasonable jury could not find with convincing clarity that Lando acted with actual malice in disregarding Hill and Donovan as individuals who were "certain" Herbert had reported the Cu Loi incident to Franklin.

This leaves us with Kahila. Viewing the evidence in the light most favorable to plaintiff, on the basis of Kahila's affidavit the jury could find that Kahila is:

"... *certain* that I mentioned to Mr. Lando my *belief* that Colonel Herbert spoke to Colonel Franklin on the helicopter radio on February 14 more than once." (emphasis added).

Kahila's own choice of words illustrates the difference in concepts, and preserves Wallace's quoted statement from the charge of falsity. There is a difference between "certain" and "believe." I believe that God exists; but, God help me, I am not certain of it. *Cf.* Mark, 9:24. Indeed, this is a distinction plaintiff's brief recognizes. On an unrelated point, plaintiff states (p. 94 n. * * * ): "Bethea believed, but could not be certain, that Barnes had merely signed the report and forwarded it to higher headquarters."

As an alternative ground for criticism, Herbert argues that responsible journalism required Lando and Wallace to refer to the Donovan statements in the program. Affidavits are submitted in support of that proposition. For example, Stephan Lesher, a professional writer and reporter, argues in respect of the Donovan statements:

"Given that a basic issue considered by the '60 Minutes' piece was whether Herbert had reported war crimes to his superiors in the Brigade, there is no way this information could have been properly ignored in the broadcast, and yet no mention of the statements was included."

Omission from the program of reference to the Donovan statements, plaintiff argues in his brief (48), "raises a fundamental question of whether defendants failed to conduct themselves as responsible journalists ..." But this is beside the point. What the program should or should not have

included in the exercise of "responsible journalism" is not an appropriate subject for legal challenge or judicial review. I will accept that the quoted statement would have more fully reflected the fruits of CBS's investigation if it had said something like this:

"Several men serving under Herbert said that they had heard Herbert say, while in Vietnam, that he had reported the February 14 killings, but none were certain that he had actually reported them, although in one statement a Major Donovan had indicated such certainty before apparently changing his mind in a later statement."

One may sympathize with Herbert's contention that CBS should have said something along these lines. But the decisive fact is that there is no evidence that the statement as phrased was false or made with actual malice.

Finally, Webb's statement to Lando (post-program but pre-article) does not bear on the issue. As noted, Herbert's claim at issue was whether or not he reported the February 14 killings to Franklin. The article's treatment of this dispute appears on p. 78. Lando writes:

"In *Soldier* Herbert claims there are several people who had seen Franklin in Vietnam on February 14. We asked Herbert for names. Not one of these people, in the Army or out, on the record or off, could back up Herbert's claim."

Lando then discusses Hill as the "key person" involved. Webb's statement was to the effect that, shortly after the incident, Herbert reported it not to Colonel Franklin, but to Major Accousti. That is not inconsistent with Lando's assertion. Compare the analysis of the Barnes-Bethea report under sub-point (a), *supra.*

These statements are not actionable.

—————

I will discuss the next two alleged false statements together. They relate to CBS's investigation into whether or not Herbert reported the Cu Loi killings directly to Franklin *in Vietnam on February 14.* As the previous discussion has shown,

this is a significant bone of contention between the two officers. Herbert insists he did so. Franklin insists he was at a Honolulu hotel on February 14. Lando and Wallace concluded, sensibly enough, that unlike many of the disputes where all they had was one man's word against another's, contemporary documentation might exist to help resolve this particular one. Hence the search for and production of the Ilikai hotel bill and Franklin's cancelled check.

Against that background, Wallace made two statements on the program which plaintiff argues, in the passages from his brief quoted below, constituted knowing defamatory falsehoods:

"(d) Wallace stated that Franklin's check for his Hawaii hotel room was 'for the exact amount of the hotel bill' (Pr.Tr. 6), while the article stated that the check was made out 'for the exact amount of the final bill, down to the last penny' (Art. p. 77). Both Lando and Wallace knew that Franklin's check was not for the 'exact amount,' but $25 less than the hotel's final bill."

\* \* \* \* \* \*

"(e) On the program, Wallace stated: 'Checking with the Ilikai Hotel in Hawaii, we found that Colonel and Mrs. Franklin had indeed been registered there from February 7 to late in the afternoon of February 14' (Pr.Tr. 6). CBS knew that the Ilikai records revealed that *either* Col. or Mrs. Franklin left on February 13 or 'early the 14th,' but not which, and Lando considered it a 'toss-up' as to which was the case."

To assist Herbert in resisting summary judgment, these statements, viewed in their surrounding circumstances, must be shown to have been false; defamatory of Herbert; and (with convincing clarity) to have been made by defendants with actual malice.

The point at issue, as Wallace made plain during this segment of the program, was whether or not Franklin was physically present in Vietnam on February 14 to receive the report which Herbert says he made to him. It would be actionable if

Wallace and Lando had stated—or had permitted Franklin to state on the program—that Franklin was in Hawaii on February 14, when Wallace and Lando had known that Franklin was not or probably was not there. In those circumstances, such a statement would be false; it would be defamatory of Herbert, within the context of the particular point at issue; and it would have been made with the requisite degree of guilty knowledge.

The two statements targeted by plaintiff do not make that particular statement. Rather, they deal with details of the CBS defendants' inquiries into the hotel documentation.

The first of these is that Franklin's check for his hotel room was "for the exact amount of the hotel bill"—"down to the last penny," the article adds—whereas in fact the check was for $25 less than the total.

Herbert's factual criticism is well taken. The hotel bill, PX 26, is in the final amount of $192.94. Colonel Franklin's check dated February 14, 1969 is in the amount of $167.94: $25 less than the total. Furthermore, Lando was aware of the discrepancy, having received both the hotel bill and the cancelled check from Franklin during an interview on December 4, 1972. Lando affidavit at ¶ 19(b), at p. 9.

However, this error is not defamatory of Herbert. It subtracts nothing from the factual thrust of the hotel bill and check, when considered together: namely, that Franklin, having made a payment by check to the Ilikai hotel on February 14, 1969, was in Hawaii on that date and not in Vietnam. The check, as noted, is dated February 14. Its amount, $167.94, was credited to Franklin's account at the hotel on February 14. If these documents had been fabricated, to portray Franklin as having been in Hawaii on February 14 when in fact he was in Vietnam, the documents and any false statements knowingly based upon them would be defamatory of Herbert in the context of the case. This particular discrepancy is not. I need not determine the reason for the discrepancy—defendants ascribe it to confusion of a $25.00 deposit made by Franklin, plaintiff challenges that explanation. It is sufficient to say that the statement in question is neither defamatory, nor probative of defendants' actual malice on the issue of Franklin's whereabouts on February 14.

The same consideration applies to the second quoted statement concerning Franklin's hotel stay which plaintiff claims to be actionable. Wallace said: "Checking with the Ilikai hotel in Hawaii, we found that Colonel and Mrs. Franklin had indeed been registered there from February 7 to late in the afternoon of February 14." In point of fact, Lando had requested CBS's Honolulu office to conduct a further inquiry at the hotel. In evidence as PX 27 is a letter dated December 8, 1982 from Robert W. Sevey, CBS's vice-president and news director, to Lando. Sevey advises that he checked out the local hotel records of the "three Army officers in question." Those officers were Franklin; Colonel John Nicholson; and Major James Crouch. The latter two officers had told Lando that they had accompanied Franklin on his return flight from Hawaii to Vietnam, leaving Hawaii late in the evening of February 14 and arriving in Vietnam on February 16. Lando affidavit at ¶ 19(a), p. 9. As to Franklin, Sevey reported:

"Col. and Mrs. Franklin checked into the Ilikai on or about February 8, 1969. They were on the special R & R rate of $25.00 a day. On February 14, 1969 the rate was reduced to $10.00, which the hotel says was the single R & R charge. This indicates that one of them left on the 13th or early the 14th. Hotel records do not reveal which."

At his deposition, Lando testified that the Ilikai hotel had just undergone a change of management. The former manager was Western Hotels. That company advised that the reduction in rate on February 14 could have reflected an early checkout rate, so that both Franklins remained until the 14th.

All of this is said by plaintiff to constitute the malicious publication by the de-

fendants concerned of a defamatory falsehood. The statement, viewed in the light of its attendant circumstances, cannot possibly rise to that level, and no reasonable jury could so find. Lando's deposition by Herbert's counsel on this point (Tr. 344–355) reveals a man unable to fully reconstruct the events from the documents available to him, but certain in his mind that Franklin spent the night of February 13 in Hawaii, and departed for Vietnam on February 14. Indeed, that conclusion would appear to be compelled by the February 14 date on Franklin's check, which he signed, and which the hotel credited against his account on that day. A stamped endorsement by the First Hawaiian Bank, Waikiki Branch, is dated February 17, 1969, a date inconsistent with misdating of the check by Franklin. It appears to be common ground that it would be physically impossible for Franklin to be in Hawaii on the morning of February 14 and back at brigade headquarters in Vietnam to receive Herbert's report on the afternoon of the same day, local time. Lando also had available to him the statements of Nicholson and Crouch that they had travelled back from Hawaii with Franklin, arriving in Vietnam on February 16 local time. Plaintiff's brief challenges the credibility of these two officers, but that is not the question: the question is whether the quoted statements in the program are actionable because false, defamatory, and made with actual malice. I conclude as a matter of law that no reasonable jury could so find with the requisite degree of proof. They accordingly are not actionable.

---

(f) Lando wrote Bittorie "had no sons" (Art. p. 78). In fact, as Lando was told by Bittorie, he had a son.

■■■ This is a reference to a statement Lando made in the *Atlantic Monthly* article. It has no counterpart in the program.

At page 78 of the article, Lando is discussing Herbert's credibility, within the particular context of his reports of war atrocities to Franklin. Lando writes:

"Herbert had also claimed that one of the brigade's top enlisted men, Sergeant Major John Bittorie, had been listening in an outer office when Herbert reported to Colonel Franklin an incident of water torture. When the Army CID questioned him, Bittorie denied Herbert's claim. Herbert told me the reason was that although Bittorie himself was retired, he still had two sons in the service and had to worry about their careers. But when I flew to Columbus, Georgia, to interview Bittorie, he again denied having overheard any such report. What about his sons who are in the Army? I asked. *He had no sons."* (emphasis added).

Plaintiff submits in opposition to the motion an affidavit executed by Bittorie. Bittorie describes his interview with Lando, which took place in December 1972. The affidavit states in part (p. 2):

"The 60 Minutes program as aired I considered a hatchet job and false since I was well aware of what I personally had related to Lando. Although I could not support Herbert's war crimes allegations, I did know that I had told Lando that I was the father of both a daughter and a son. I also had told him that although that son was not now in the Army he had been previously when I had made the statement concerning his career to Herbert (at the time of my sworn statements)."

I can hardly conclude, on these motions for summary judgment, that if Bittorie repeated that testimony at trial, the jury would reject it. Nothing appears in Lando's reply papers to suggest that Bittorie's account is inherently implausible or unworthy of belief. Lando does not submit a reply affidavit denying that Bittorie told him he had a son serving in the Army at the time of Herbert's conversations with him. And even if Lando had submitted such an affidavit, it would have done no more than create a credibility issue which could not be resolved on summary judgment.

Furthermore, it is clear that if the jury accepts Bittorie's account, it could also find upon clear and convincing evidence that Lando published in the *Atlantic Monthly* a false statement, defamatory to Herbert, and with knowledge of actual falsity. The statement "Bittorie had no sons" is defamatory of Herbert because, in the context in which the statement is made, it accuses Herbert of having lied to Lando.

Lando's reply brief (at 16) argues that "plaintiff does not refute the gravamen of the statement: Bittorie denied hearing Herbert report a water torture to Franklin, and was not under pressure to do so; he only quibbles whether Bittorie had sons." That is not an adequate answer. There were two "gravamens" of the quoted paragraph: a particular one (Herbert did not report water torture to Franklin), and a general one (Herbert tells lies). It is in the latter, discrete context that the statement is defamatory; and a trial jury could find actual malice on the part of Lando with respect to its publication.

This statement is actionable.

---

(g) Wallace stated, "You have no documents to show, not a piece of paper to show that you ever reported a war crime to anybody prior to the time that the My Lai trials were going on at Fort McPherson, Georgia" (Pr.Tr. 7), while defendants knew that Herbert's report of the An Khe mistreatment, the Arnold Report, and Boyer's statement of September 10, 1969, were all "pieces of paper" which showed Herbert reported a war crime to somebody prior to the My Lai trials.

■■■ This statement by Wallace occurred during an exchange on the program that was initiated by a rhetorical question posed by General Barnes. The exchange in its entirety goes like this:

"BARNES: Why didn't he do something that had a date on it that would prove that he did report those things? He had plenty of time to do it. He left the brigade, he was down in Saigon three months where he had this court of inquiry, this Article 138. He had plenty of time to jot something down on a piece of paper, to get it notarized. Why didn't he?

"WALLACE [to Herbert]: You have no documents to show, not a piece of paper to show that you ever reported a war crime to anybody prior to the time that the My Lai trials were going on at Fort McPherson in Georgia. You were in Fort McPherson, Georgia, at the very same time that those My Lai trials were going on and then suddenly you went public.

"HERBERT: Let's say that we—I'm not going to say we don't have documents to show that I reported war crimes in Vietnam. That's not for me to say here. I say that we can prove that I did report them in Vietnam.

"WALLACE: You have documents to prove—

"HERBERT: I'm not going to say we have documents or not. I just say we have statements—sworn statements—and testimony that will prove that I reported war crimes in Vietnam.

"WALLACE: Have you—have you published them in your book?

"HERBERT: I don't think so.

"WALLACE: Why?

"HERBERT: I didn't—I had no reason to. It was already in the paper, other things. I don't know why. I have lawyers, just like you have lawyers. We didn't put everything out we have."

The full exchange makes it clear that Wallace was focusing upon whether or not Herbert could produce from his own files "documents" or a "piece of paper" to show that Herbert had in fact reported war crimes prior to the notorious My Lai trials, then underway at Fort McPherson, to which Herbert had been transferred over a year after he left Vietnam. While Herbert evaded the question when Wallace put it to him on that part of the program which was aired, he had acknowledged the truth of the assertion at another point in his interview with Wallace, which was not aired. It

is the practice in preparing such television programs to shoot more interview footage than is actually used. The unused portions are called "outtakes." The transcript of outtakes from the Wallace-Herbert interview is in the record as AX 255. The following exchange appears at p. 15:

"MR. WALLACE: .... The fact remains, Col. Herbert, that you never told anybody about this. You never put anything on paper about reporting war crimes until virtually a year and a half after those crimes took place.

"COL. HERBERT: On paper.

"MR. WALLACE: On paper.

"COL. HERBERT: That's true."

Herbert, having acknowledged the truth of the challenged assertion, is in no position to charge Wallace with knowledge of its falsity. The argument in plaintiff's brief relies upon the possible existence of documentary reports in Army files. The first references to some of them came in CID investigation reports which were not available to CBS at the time of the program. In any event, Wallace's statement when viewed in proper context is true, and acknowledged by Herbert to be true. Having obtained that acknowledgement, Wallace cannot be faulted for making use of it in that portion of the program which was aired.

This statement is not actionable.

(h) Wallace stated that Stemme described Herbert as present "as a Viet Cong nurse was being interrogated by ARVN troops, being beaten by them to get her to talk" (Pr.Tr. 12). In fact, Lando knew that was not what Stemme had told him.

■ This particular statement forms part of an exchange on the program which, for the sake of context and clarity, I will quote at greater length.

Wallace introduces the subject by saying: "Another thing that we found out checking out Herbert's book: Although several men who served with Herbert say it's not so, there are others who claim that Herbert was an officer who could be

brutal with captured enemy prisoners himself."

Colloquy on this subject between Herbert and Wallace ensues. A witness named Bruce Potter appears and gives an account of an incident with which I need not be concerned. The following then transpires:

"WALLACE: All right. All right, now—

"HERBERT: —you know?

"WALLACE: —another man: Bob Stemmies [sic].

"HERBERT: Bob Stemmies?

"WALLACE: Do you know him?

"HERBERT: No, he wasn't—didn't work for me, but I do know him, yes.

"WALLACE: Well, he was a military intelligence sergeant.

"HERBERT: Yes.

"WALLACE: You spoke very highly of him on the Cavett show back in '71—September.

"HERBERT: Yeah, I spoke—Well, I knew about him as an IG, yes.

"WALLACE: Stemmies told us that he was present once with you as a Viet Cong nurse was being interrogated by ARVN troops, being beaten by them to get her to talk, you were there, stood by, did nothing.

"HERBERT: Well, let me tell you this. As long as I was in Vietnam, my unit never captured a single nurse. And you won't find anything about a nurse in any of our records."

The individual in question was one Robert Stemme, who at the pertinent times served in Vietnam as a special agent, Counterintelligence Section, 172d Military Intelligent Detachment, attached to the 173d Airborne Brigade. In his affidavit (¶¶ 11, 12 at p. 5) Lando gives this account of his interviews of Stemme:

"11. Herbert had referred me to Robert Stemme, a Military Intelligence ('MI') sergeant, as a man who would corroborate his claim of having reported war crimes and been relieved as a result. In fact, the information I learned from Stemme was staggering:

"Herbert had told me that Stemme had reported mistreatment of prisoners to him. Not only did Stemme deny this, but he told me that Herbert was the last person to whom he would have reported war crimes. Stemme said that Herbert did nothing while South Vietnamese police broke a Vietnamese girl's fingers during an interrogation. He also told me that Herbert was constantly bringing prisoners into the MI compound, insisting they were enemy even though the large majority of these 'prisoners' were innocent civilians. Stemme insisted that Herbert was just not the type of person who would report war crimes. Moreover, he said that his position in the MI would have made him privy to reports of war crimes had Herbert made any. Stemme thought that Herbert had been relieved because the Brigade was implementing the government's pacification program and Herbert was just too 'gung ho.' His view was that Herbert's charges were a reaction to his having been relieved of his command.

"12. Although statements of career officers might be suspect, Stemme had been discharged from the Army by the time I spoke to him. I also found Stemme credible because he was associated with the Vietnam Veterans Against the War; although Stemme was sympathetic to the anti-military position that Herbert was espousing, he thought Herbert's charges were made up out of whole cloth."

Lando's affidavit also recites (¶ 36(c) at p. 19):

"As I mentioned earlier (*ante* par. 11), Stemme had related an incident in which Herbert stood by and did nothing while a Vietnamese female was tortured. Stemme also suggested that I interview Fred Brown, who had served with him in the MI, and who he said was present during the incident. When I spoke to Brown he confirmed that he was present during the incident related by Stemme."

Lando interviewed Stemme by telephone on three separate occasions. The first took place in mid-March of 1972. Stemme had been discharged from the Army in January 1970. A transcript of the tape of that conversation is in evidence as PX 178. It reads in part (pp. 15–16):

"STEMME: Do you know what Field Force National Police are?

"LANDO: Yeah.

"STEMME: Okay, well the Vietnamese Gestapo, okay. And we were out in the field and we—we accidentally ran into some military aged males, this was a real rarity (indistinct) village, and Herbert sat them down and he was convinced, you know, we had them lined up, he was going down saying and this must be _____S–1 and this is DS 2 and this is DS 3 and this is DS 4. About fifty feet away from that, there was some Vietnamese National Field Force, National Police, .... interrogating a fifteen year old Vietnamese female. Breaking her fingers. And Herbert was right there. And I didn't stop it and he certainly wasn't—

"LANDO: He knew what was going on?

"STEMME: What?

"LANDO: He knew what was going on?

"STEMME: Yeah."

Lando spoke again by telephone to Stemme on December 14, 1972. Lando's handwritten notes are PX 179. The notes include these references:

"—Young girl being interrogated by National Police Field Force/2 guys holding her and they breaking her fingers. Brown there. 2nd Lt. was there. Second Lt. lines up."

This is based on Lando's reading of his notes at his deposition, Tr. 2365. The reference to "Second Lt. lines up" "had some relation to that interrogation that Stemme had said that he had witnessed with Herbert," although Lando had no recollection of what the reference meant specifically. Deposition at 2371–72.

Subsequently Lando spoke again by telephone to Stemme. Lando's notes of the conversation form PX 180. Lando read the pertinent notations into his deposition record at Tr. 2376:

"A. 'Bob Stemme. We had gone into hamlet with Herbert just south of Tiger Mountains—operation put together on basis of alleged source. And we went over there to look for with one of Herbert's platoon/platoon leader had all people lined up, Fred, my interpreter and Col. Herbert walking around. One of them had that girl. He was behind her holding her and guy in front of her holding arms outstretched, wrist—guy asking questions, breaking fingers/Herbert and I standing not more than 4 or 5 feet away—...' " "

As noted in Lando's affidavit, Lando at Stemme's suggestion interviewed one Fred Brown about this incident. Brown had also been attached to the 172d Military Intelligence. He was discharged from the Army in August 1969. Lando interviewed him by telephone on December 14, 1972 and again on February 6, 1973. Lando's notations of these conversations are PX 181 and PX 182. The notes of the December 14, 1972 conversation contain these statements:

" 'I was E4—I know for fact when we out on operation—joint near the coast, Herbert commanded operation/Herbert interrogation of VC nurse—he told police take her around back of building and interrogate/Bob and I sent out there to observe and bring back prisoners for interrogation/2 days later sent back by Vietnamese all beat to hell. Herbert knew this stuff was happening, he standing not 50 feet away/as an officer you don't walk around the corner.' "

See Lando deposition at 2383–84. The notes of the February 6, 1973 conversation say in their entirety: "Fred Brown-confirms that was VC nurse." At his deposition, Lando gave this testimony (Tr. 2401):

"Q. Did you ask Fred Brown whether he was sure that it was a VC nurse?
"A. I don't recollect what my specific question was to him. I just asked him if he could confirm that it was a VC nurse as he originally stated to me."

Brown has given an affidavit in support of defendants' motion. It reads in pertinent part:

"As I told Barry Lando in 1972, I was present during an operation Herbert commanded near the coast. A Viet Cong nurse was captured and Herbert told the National Police to take her around the back of the building and interrogate her. It was clear to everyone present that Herbert was turning the nurse over to the National Police with the knowledge that she would be brutalized."

Plaintiff argues in his brief (at pp. 76–82) that there are discrepancies between Stemme's accounts of this incident, as well as between the accounts given by Stemme and Brown; and that Lando should have realized Stemme had reason to dislike Herbert. Herbert also makes the point that Stemme's ten statements to the CID, while containing discussions of other tortures and killings, do not refer to the alleged incident referred to on the program. The CID statements, of course, were not available to CBS at the time of the program. Plaintiff argues in his brief that Lando should have asked Stemme for copies.

While it is true that there are some discrepancies in the details of the several accounts given of this incident by Stemme and by Brown, they do support the main thrust of what Wallace said CBS was told by Stemme: namely, that Herbert was present when a Viet Cong female was being interrogated by South Vietnamese troops, that she was being beaten by those troops, that Herbert was aware of the beating, and did not intervene.

Herbert, as noted, denies that such an incident took place. There is no evidence that the CBS defendants knew that Stemme's account was fabricated. The remaining alternative basis for liability is that the defendants published the account recklessly. In *St. Amant v. Thompson,* supra, the Supreme Court said that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732, 88 S.Ct. at 1326. In a footnote the Court cited for that proposition the concurring opinion of Chief Justice Warren in *Curtis Publishing Co. v.*

*Butts,* 388 U.S. 130, 169–170, 87 S.Ct. 1975, 1998–99, 18 L.Ed.2d 1094 (1967). The Chief Justice said at 169, 87 S.Ct. at 1998: "The slipshod and sketchy investigatory techniques employed to check the veracity of the source and the inferences to be drawn from the few facts believed to be true are detailed at length in the opinion of Mr. Justice Harlan." At 388 U.S. 157, 87 S.Ct. at 1992, Justice Harlan observed that the publisher of the defamatory article knew that its sole source, one Burnett, "had been placed on probation in connection with bad check charges, but proceeded to publish the story on the basis of his affidavit without substantial independent support." Other indicia of "slipshod and sketchy investigatory techniques" are recounted at 157–58, 87 S.Ct. at 1992–93.

In the case at bar, assuming *arguendo* that a trial jury accepted Herbert's denials and branded Stemme's account as false, the jury could not find by clear and convincing evidence that the CBS defendants proceeded recklessly in publishing that account. There was no apparent reason to doubt Stemme's veracity. Indeed, Herbert had himself referred Lando to Stemme. Stemme's account is not inherently implausible or untrustworthy. In its salient features, Brown's account corroborates Stemme more than it contradicts him.

This statement is not actionable.

---

(i) Wallace stated: "We have spoken with many men who saw Herbert after his relief in Vietnam ... to a man they say that Herbert never once said to them that he had been relieved because he had tried to push war crimes charges" (Pr.Tr. 9). Lando had been told, in words or substance, the exact opposite by at least three men whom he spoke to whom [sic] had seen Herbert after his relief.

 This statement by Wallace followed immediately upon Wallace's exchange with Herbert about whether or not Herbert was referred to Colonel Rector by Colonel Douglass after Herbert had been relieved of his command. Herbert says that he never saw Rector. Wallace then says this (the allegedly false and defamatory statement being italicized):

"Okay.

"But when 60 MINUTES contacted Colonel Rector, he said that he had indeed spoken with Colonel Herbert at some length about his relief from command, but that Herbert never claimed that war crimes had anything to do with it.

"In fact, over the past several months, we have spoken with many men who saw Herbert after his relief in Vietnam. Some are still in the service, some are out. Most of them admire Herbert, *yet to a man they say that Herbert never once said to them that he had been relieved because he had tried to push war crimes charges.*"

What Wallace is clearly focusing upon is whether or not Herbert ascribed his relief from command to his war crimes charges shortly after his relief, while Herbert was still in Vietnam. As noted, one of the thrusts of the program was that Herbert did not begin to mention his war crimes charges as a reason for relief from command until he had arrived at Fort McPherson, over a year later.

Having stated: "we have spoken with many men who saw Herbert after his relief in Vietnam," Wallace adds the allegedly false and defamatory assertion: "to a man they say that Herbert never once said to them that he had been relieved because he had tried to push war crimes charges." The phrase "to a man" admits of no exceptions. It is false, and, in context, defamatory if in fact one individual told Lando that while Herbert was still in Vietnam, Herbert expressed to that individual a belief that his pushing war crimes charges caused him to lose his command.

Plaintiff charges in his brief that "Lando had been told, in words or substance, the exact opposite by at least three men whom he spoke to whom [sic] had seen Herbert after his relief." The relevant argument in the brief (at 153–56) mentions three individuals: Kahila, Moore, and Beamer. I need not dwell upon Moore or Beamer because,

as plaintiff's own discussion reveals, whatever Herbert said to these individuals on the subject occurred after he had returned to the United States from Vietnam.

That leaves us with Kahila, the helicopter pilot. As noted *supra*, Kahila has given an affidavit in opposition to the present motions. In that affidavit, Kahila says at ¶ 7, pp. 3–4:

"7. I flew Colonel Herbert to An Khe when he was relieved from command. I specifically recall his sitting on the landing pad and talking to me. He mentioned reporting the killing of the prisoners at Cu Loi action to Colonel Franklin and said that had become a problem because there was a lot of Army politics as to whether anything should be done about it. He said that he thought that this Army politicking was why he was relieved from command."

In ¶ 10 of his affidavit, Kahila describes his interviews with Lando. He says:

"I also told Mr. Lando about the conversation that Colonel Herbert had with me when he was relieved from command. I further recall telling Mr. Lando that Colonel Herbert said his relief was part of Army politicking resulting from his reporting the Cu Loi killings and Brigade's view that what to do about it had become a problem."

The CBS defendants argue in their reply papers (Eldridge affidavit at ¶ 18) that Kahila's present claim—that he told Lando that Herbert said on the day of his relief that this relief was due to Army politicking over what to do about the Cu Loi killings—should be disbelieved because inconsistent with prior statements made by Kahila to Morgan and to Lando. Those inconsistencies are arguable; although Lando's handwritten notes of what Kahila said to him are not necessarily inconsistent with Kahila's present account. PX 48 includes Lando's notes of a telephone interview with Kahila on January 10, 1973. Lando interpreted them for the record at his deposition at Tr. 637–38. Kahila describes the Cu Loi incident and his observations about wheth-

er or not Herbert reported it. The notes then read:

"Herbert told me he had reported not that night/day. We flew him out of there and on An Khe/I think he mentioned it then/he called it Army politics."

Lando was questioned by plaintiff's counsel about these rather cryptic notations. He testified as follows (Tr. 643–44):

"Q. The next line says, 'Not that night/day we flew him out of there to An Khe.'

"Did Kahili [sic] tell you that he was the pilot who flew Herbert to An Khe when Herbert was relieved of his command?

"A. From these notes I can't tell if Kahili is telling me there he was the pilot or if he was along on the flight.

"Q. In any event, he did tell you he was along on the flight?

"A. Yes.

"Q. Did he tell you it was at that time that Herbert talked about reporting the war crimes or reporting the February 14th events?

"A. What Kahili said, he said, 'I think he mentioned it then.'

"Q. Did Herbert declare that reporting of those war crimes or the February 14th events part of Army politicking?

"A. No, I don't think so. I think this right here refers to why Kahili—or why Herbert had told Kahili he had been relieved of command. In other words, Army politics.

"Q. When Kahili told you he thought Herbert mentioned reporting February 14th events on the flight down to An Khe did you ask Kahili whether Herbert said that was one of the reasons Herbert said he was being relieved of command?

"A. From these notes I can't tell but I think when he said he called it Army politics I'm pretty sure that came after my question of did Herbert say why he had been relieved of command."

This testimony is not entirely clear. Lando appears to recall Kahila telling him that Herbert mentioned war crimes or reporting the February 14th events on the flight from An Khe, but not that Kahila under-

stood Herbert to be including those subjects as a component part of "Army politics."

There is thus a dispute, turning in significant measure upon issues of credibility, about what Kahila said to Lando on this particular subject. I do not propose to resolve that issue on a motion for summary judgment. Defendants' counsel argues in his reply affidavit (¶ 18): "Kahila's current statements cannot create an issue as to what defendants knew ten years ago." That misses the point. The significant date is not the post-program date of Kahila's affidavit, but the pre-program dates of Kahila's interviews with Lando. Kahila says that on the flight from An Khe Herbert complained of "Army politics" as the reason for his relief from command. Lando acknowledges that Kahila quoted to him Herbert's reference to "Army politics." The dispute is whether, in his interview with Lando, Kahila quoted Herbert in substance as saying that the "Army politics" related to and were triggered by Herbert's report of the Cu Loi killings to Colonel Franklin. That is precisely what Kahila says he told Lando. If a jury accepts such testimony and rejects Lando's contentions that either Kahila did not say that or Lando innocently misunderstood him, then a trial jury could find with the requisite degree of certainty that the quoted statement was false, defamatory, and made with actual malice.

This statement is actionable.

---

(j) The article stated: "It was only after Herbert had been transferred to Fort McPherson, Georgia, where the My Lai trials were in full swing, that there is any solid indication he was thinking about reporting war crimes" (Art. p. 79). Lando knew from numerous people he spoke to that Herbert talked in Vietnam about the war crimes and having reported them and that he had been seen or heard talking about the Cu Loi murders on the radio and at Brigade Headquarters.

While defendants do not make this particular argument, I conclude that the quoted statement, viewed in context, is one of opinion rather than a representation of fact. As such, it enjoys absolute First Amendment protection, and consequently is not actionable.

As Lando pressed his inquiries, interviewing first Herbert and then others, and collecting and examining documents, a central dispute emerged as to whether or not Herbert had reported war crimes prior to his transfer to Fort McPherson, Georgia. As has been observed *supra* in connection with other challenged statements, it was not until Herbert arrived at Fort McPherson that he preferred and filed with the Army formal written charges alleging war crimes and atrocities by elements of the 173d Airborne Brigade, as well as charges against Franklin and Barnes for failing to investigate or report them. The two paragraphs in the *Atlantic Monthly* article preceding the quoted statement (which appears on p. 79) make the points that there was no mention by Herbert of war crimes in the transcript of the Article 138 inquiry into his relief from command; and that the statements Herbert obtained from witnesses while he was at Fort Leavenworth after leaving Vietnam praise him as a commander and as such were useful in Herbert's appeal from his unfavorable efficiency report; "but there is not a word relating to war crimes." The challenged sentence then follows immediately.

Lando's affidavit (at ¶¶ 26–30) makes it clear that during the course of his inquiries, he reached the conclusion that Herbert's war crimes charges, formally asserted at Fort McPherson, were defensive afterthoughts, and that Herbert had not mentioned war crimes while still in Vietnam. Lando lists in his affidavit the reasons why he reached that conclusion: the specific denials of Colonel Douglass and Colonel Rector, Judge Advocates at Saigon, that Herbert identified his war crime reports as the reason for his relief from command; the absence of any reference in the Article 138 proceedings of war crimes, and the denial of officers and attorneys concerned

that Herbert was prevented from raising the subject, as Herbert claimed; Herbert's conceded inability to produce copies of any documentary war crimes charges until the filing of charges at Fort McPherson; and other factors.

Herbert argues in his brief (at 50–53) that various individuals told Lando that Herbert had referred to war crimes and atrocities while still in Vietnam, that atrocity incidents were "common knowledge," and that Herbert had been heard at brigade headquarters discussing the subject on various occasions. From this evidence, Herbert argues that Lando acted with actual malice in making the false and defamatory statement that it is only after Herbert's transfer to Fort McPherson that "there is any solid indication he was thinking about reporting war crimes."

To be actionable in a public figure defamation case, assertions must be construed in context "as representations of fact," as opposed to editorial opinions. *Loeb v. New Times Communications Corp., supra,* at 497 F.Supp. 90–91. As Judge Brieant observed in *Reliance Insurance Co. v. Barrons's, supra,* at 442 F.Supp. 1350, what is actionable is "misquotation or falsification of a hard fact (as distinguished from an opinion) ..."

If Lando had written that it was only after Herbert was transferred to Fort McPherson "that there is *any* indication he was thinking about reporting war crimes," plaintiff's allegation of falsity might be arguable. But Lando did not say that. He said instead that only at such time was there "any *solid* indication" (emphasis added). In context, the adjective means "Sound; reliable; concrete: *solid facts.*" *The American Heritage Dictionary of the English Language* (1976) at 1229 (emphasis in original). Lando, in the quoted assertion, is expressing his personal evaluation of the evidence revealed by his inquiries. His statement concedes by implication the existence of some indications of an earlier concern on Herbert's part; but in view of the indications pointing the other way (which cannot be dismissed as inherently implausible, although Herbert argues against them), Lando formed the opinion that the earlier indications were neither sound nor reliable—hence not "solid." This is an opinion which the First Amendment entitles Lando to hold and to express without challenge in a court of law.

This statement is not actionable.

------

(k) Lando wrote that Wooten has come to believe in "most of [Herbert's] claims" (Art. p. 74) when Wooten never limited his belief in Herbert.

 The challenged statement is taken from a paragraph in the *Atlantic Monthly* article which appears at p. 74. That paragraph reads in full:

"In a July, 1971, interview in *Life* magazine, Herbert suggested that war crimes might stop 'if we'd hang a couple of senior commanders.' In September came his big breakthrough: a lengthy article ('How a Supersoldier Was Fired From His Command') in the Sunday magazine section of the New York *Times.* The piece was written by the *Times* Southern correspondent James T. Wooten. Wooten had covered Herbert since he first made his charges public, and had come to believe fully in the man and most of his claims."

Subsequently Wooten co-authored the book *Soldier* with Herbert. Lando points that out in the next paragraph in the article, which reads in part:

"At the time, and for months after, I thought Wooten's article to be an excellent description of Herbert and his case. Unlike several reporters who became suspicious of Herbert soon after they started checking into him, I didn't develop doubts until after several weeks of research. Wooten, who later collaborated with Herbert on his book, *Soldier,* today says he still believes in Herbert."

Herbert challenges as false, defamatory and malicious the statement that Wooten "had come to believe fully in [Herbert] and *most* of his claims" (emphasis added). Plaintiff's brief argues that "Wooten never

limited his belief in Herbert." I take that to be an assertion that, in truth, Wooten believed in all of Herbert's claims. The CBS defendants say: "Wooten swore that Lando's recitation of his statements is accurate." Reply brief at 18. The only evidence to which I am cited by the parties is Wooten's deposition. However, Lando does say in his deposition at ¶ 49, p. 26:

"In preparation for the article I did additional research and investigation. In light of my particular interest in exploring the media's handling of Herbert, I spoke to several journalists who had investigated Herbert's claims. I also interviewed the editors at Holt, Rinehart and Winston who had worked on *Soldier*, and I spoke to Wooten a number of times to make sure the article accurately captured his perspective and beliefs as well as those of Herbert's publisher."

Lando and Wooten had discussed Herbert before the program was aired, and Wooten also had a telephone conversation with Wallace. Wooten described one conversation he had with Lando in Washington in December of 1972. Wooten viewed his relationship with Herbert at the time as "that of a reporter, who was writing about him and his case for the New York Times." Tr. 106–07. At that conversation, Lando expressed skepticism about Herbert's story, and Wooten responded that he was not surprised that the Army was attacking Herbert's veracity. That was because, in Wooten's view:

"The United States Army is not an institution that, to my knowledge, readily or ever admits fault institutionally, and if there is fault, in any given relationship, incident, etc., it is never the Army's institutionally. It is always someone else's." Tr. 109.

In a pre-program telephone conversation with Wallace, Wooten described Wallace's questions as being "negative" and with "a hostile edge to them." Tr. 115. The possibility of Wooten appearing on the 60 Minutes segment was discussed, but that never came to pass.

After the program, Lando began preparation of his magazine article. In the course of that preparation he telephoned Wooten on more than one occasion. I will quote Wooten's deposition testimony that bears upon the present claim:

"Q. Did you tell Barry in his conversation you no longer knew what to think about Herbert?

"A. No.

"Q. Did you ever tell Barry that?

"A. No. That subject came up in connection with the article, and I am told he said that on television, but I am not sure. That's what I was told. I don't remember by whom. He called me and wanted to know—he was going over quotes from me for the Atlanta [sic] article, and I think after that—I think there were others, too, but I never told him that.

"I think I may have said something to the effect that I realize that in a situation like this it is difficult to know who to believe, but this is a kind of story that really tests your instincts of who is telling the truth, or something of that nature, but I never told him that.

"I told him that, that day, when he called me to check that quote.

"Q. This is at a later period of time?

"A. Yes. We're talking about—Barry called me later, and I don't really know quite when to see if—to go over quotes with me, but I—things I had said, things that—he used that with me, and said, 'Can I use that'.

"I asked him, because of—I was in a rather sensitive position being a New York Times reporter, and I asked him as a favor if he was going to quote me—to tell me what he was going to quote, and see if I really said that. To call me back, and he did.

"He didn't use it in the article, which I appreciated, and which is what I would have done and what he did."

* * * * * *

"Q. When Barry spoke to you on the phone were you aware, prior to the conver-

sation that he was writing an article about Herbert, at the time of his calling you?

"A. Yes, I know what you mean. I would assume so, yes. Yes, I guess so, because I was aware of the function of that call was to—as I said to ascertain whether he had my permission to say that I said this and that, so I would assume I knew he was writing an article."

\* \* \* \* \* \*

"Q. Other than what you testified to, can you recall discussing anything else in this telephone conversation with Barry Lando in which he went over with you the advance and other areas you've mentioned?

"A. I don't recall. I do not recall anything specifically.

"Q. Did he tell you he would put in the article that you still believed in Herbert?

"A. That rings a bell, yes. I may have even asked that he—if he found a way to do that. I may have even asked that he do that."

\* \* \* \* \* \*

"Q. Did Barry tell you he would put in the article what you thought about Herbert?

"A. Specifically that I still believe in him? I don't recall that he said he would. My impression is that, yes, he said he would."

\* \* \* \* \* \*

"Q. Did you receive a copy of the Atlantic Monthly article prior to its being published?

"A. I did not, but I don't believe that I—one was actually sent to me. I did see it prior to its publication, and I believe it was provided for me, to me by either Mr. McCauley [Herbert's literary agent] or Mr. Morgan [Herbert's attorney] or both at the same time.

"Q. When McCauley or Morgan showed it to you was that prior to its being published in the—

"A. I believe so, yes.

"Q. And was this a meeting—the occasion of Morgan or McCauley showing it to you?

"A. It was not a meeting specifically for that purpose. I believe it took place in Long Boat Key, Florida, where the three of us and others had gathered to participate in Spring training with the Pittsburgh Pirates—middle age men gone senile.

"And we were all there and I believe that is—I believe it was at that time and that place that I saw the article, which was before it was published.

"Q. Did you have any discussion with Morgan or McCauley about the article at the time you saw it?

"A. I think we discussed whether or not—this is very vague in my mind, but I think we discussed the idea of whether we ought to—one of us, three of us or Col. Herbert—may have been Atlantic—I don't know if Atlantic had offered or if they were talking about demanding that we be allowed to respond, we being Col. Herbert, to Barry's piece in the same issue.

"I think there was some discussion of that among the three of us, and some debate back and forth as to whether—I am sorry I am vague—as to whether there was an offer or if this was simply an idea that had its origin in that meeting.

"Q. Did you say to McCauley or Morgan in words or substance that one shouldn't pay too much attention to the article?

"A. I may have said something like that. What I recall my position was, on the question of whether or not we should try to respond, my position in this debate or discussion, whatever it was, that no, don't respond to it.

"So I may have said something—don't—what you said—which was, don't pay too much attention. I may have said exactly that, but I don't recall saying exactly that.

"Q. Do you recall what McCauley said?

"A. No, I don't. I really don't.

"Q. Did you discuss with McCauley or Morgan in this conversation inaccuracies in this article?

"A. I don't recall, I assume that we did.

"Q. Did you tell Morgan or McCauley in this conversation that you had spoken to Barry in connection with the article?

"A. Did I tell them down in Florida that I had spoken?

"Q. Yes.

"A. I told them down there, I think, I certainly would have told them at one point if the subject had come up. I don't recall specifically.

"Q. Was the information you had discussed with Barry in your telephone conversation concerning the article, accurately reported in the article?

"A. As I recall I believe so. You mean regarding the details of the contract with Holt for the book? I think so. As I recall, I—

"Q. Regarding your position concerning Col. Herbert?

"A. I think so. It has been some time since I read the Atlantic article, but I believe so."

\* \* \* \* \* \*

"Q. You testified before that you thought the information you discussed with Barry in connection with the article was accurately reported in the article, and I would like you to look at the article, which you said you hadn't read in a while, and tell me if that is so.

"A. On page 74 of the article there is— the following line—'The piece was written by the Times Southern correspondent, James T. Wooten. Wooten has covered Herbert since he first made his charts public, and has come to believe fully in the man and most of his claim [sic].'"

"I am not going to argue with the reporting of that, but at the same time, it suggests that there are claims he had made, that I do not believe in and I am not aware of any claims that he's made that I don't believe in, so I don't find that to be distorted, inaccurate."

Tr. 111–13; 129–35; 138–39.

On this evidence, which is all that is offered, no reasonable jury could find with convincing clarity that Lando knowingly included in his article a false description of Wooten's state of mind about Herbert.

Preliminarily, it is clear from the article, viewed in the light of Wooten's testimony, that the challenged phrase—Wooten had come to believe in "most of [Herbert's] claims"—is a statement of Lando's perception of the state of Wooten's mind. The phrase does not purport to be a direct quotation from Wooten. As Wooten's testimony shows, during preparation of the article Lando was careful to check with Wooten the accuracy of possible quotations from him. The evidence reveals that on at least one occasion, when Wooten did not accept the quotation—that he "no longer knew what to think about Herbert"—Lando did not use the quotation in the article, for which Wooten was duly appreciative. When Lando is actually quoting Wooten, he says so, as in the statement in the article (favorable to Herbert): "Wooten, who later collaborated with Herbert on his book, *Soldier*, today says he still believes in Herbert." That quotation, Wooten's testimony shows, Lando included in the article at Wooten's particular request.

I appreciate that Wooten at his deposition picked up on the suggestion in the statement "that there are claims he had made that I do not believe in and I am not aware of any claims that he's made that I don't believe in ..." That is, of course, the negative pregnant that underlies the present claim. But Wooten was hardly outraged by it; "I am not going to argue with the reporting of that," he said, and testified in general that the substance of his telephone conversations with Lando about the article were accurately reported. Furthermore, when McCauley, Morgan and Wooten (Herbert partisans all) discussed the Atlantic article after it had appeared, it was Wooten's recommendation to make no response to it, to not pay too much attention. This is not the reaction of a journalist who considers that he has been substantially misquoted.

Viewed in context, the challenged statement represents Lando's evaluation of

Wooten's attitude towards Herbert. There is no evidence that Lando did not arrive at that evaluation in good faith. There is no evidence that Lando fabricated a quotation from Wooten, or deliberately distorted anything that Wooten said to him. No reasonable jury could find actual malice in these circumstances.

Finally, I conclude as a matter of law that these particular words, when viewed in context, are not "reasonably susceptible of a defamatory connotation," that being a question for the Court and not the jury. *Ladany v. William Morrow & Co., Inc.,* 465 F.Supp. 870, 871–72 (S.D.N.Y.1978) (citing and quoting New York cases). The allegedly offending phrase—that when he wrote his New York Times article about Herbert, Wooten "had come to believe fully in the man and most of his claims"—is followed in the next paragraph by the quotation from Wooten that "today ... he still believes in Herbert." Read together, these statements constitute a vote of confidence, not condemnation.

This statement is not actionable.

---

I need not and do not deal with every issue raised by the parties' comprehensive papers on the subject of actual malice. But I will comment on two related aspects of the case, upon which plaintiff places an entirely understandable emphasis. The first is what plaintiff characterizes as the "predetermined portrayal" of his acts and character. The other is what he terms Lando's "hostility" towards him.

 It is not really disputed by the CBS defendants that when Lando first approached Wallace with a suggestion that "60 Minutes" present a favorable treatment of Herbert and his charges against the Army, Wallace discouraged him. In Wallace's view, sufficient had been said in the media in praise of Herbert; Wallace made it clear to Lando that "60 Minutes" would be interested only if an investigation turned up unfavorable information about Herbert. Lando withdrew from the executive suite and dug further.

This editorial decision is undoubtedly galling to Herbert. But it is an ancient journalistic truth that bad or unpleasant news is often more exciting (or "newsworthy") than good or complimentary news. No doubt those concerned with "60 Minutes" regard themselves as "investigative reporters." That is the current parlance of journalistic chic, having achieved a particular prominence during Watergate. But it is a reportorial phenomenon that was recognized at least as early as the turn of the century. "Investigative reporters" were in those earlier days called "muckrakers." In a speech in 1906, President Theodore Roosevelt borrowed that name from John Bunyan's 17th century Puritan allegory *Pilgrim's Progress.* Bunyan wrote of a man "with the Muck-rake in his hand," who would rather rake filth than look upward to nobler things. Roosevelt said: "Men with the muck-rakes are often indispensible to the well-being of society; but only if they know when to stop raking the muck." American muckrakers of distinction include Lincoln Steffens, Ida Tarbell, Ray Stannard Baker, and the novelist Upton Sinclair. Ralph Nader's *Unsafe at Any Speed* (1965), an example of more recent "muckraking," forced reforms on the automobile industry.[1] In *Curtis Publishing Co. v. Butts, supra,* Chief Justice Warren took a less charitable view of the *Saturday Evening Post's* declared policy of "sophisticated muckraking," appending the following footnote at 388 U.S. 169, 87 S.Ct. at 1998:

> "Webster's New International Dictionary (2d ed., unabr.), p. 1606, reports the source of the term 'muckrake' as follows:
> " 'On April 14, 1906, President Roosevelt delivered a speech in which he used the term *muckrake* in attacking the practice of making sweeping and unjust charges of corruption against public men and corporations....' "

---

1. Much of this discussion is derived from Chalmers, David M., *The Muckrake Years* (Van Nost-rand-Reinhold 1974).

"Roget's International Thesaurus § 934(3) lists the following as synonyms: muckrake, throw mud at, throw or fling dirt at, drag through the mud and bespatter."

Pursuing their particular passions, the muckrakers of yesterday and investigative reporters of today have logical publishing preferences. The muckraker who rakes no muck is boring. The investigative reporter whose investigations unearth nothing but purity and virtue, instead of corruption and vice, is not going to get as many published stories appearing under his by-line as his colleague with a keener nose for fools and knaves in high places. It is a melancholy but accurate reflection upon the public taste that vice is more interesting than virtue. Wallace's editorial preference for "60 Minutes" reflects that truth. It does not constitute actual malice for First Amendment purposes.

The objects of self-appointed muckrakers' or investigative reporters' interest seldom welcome their attentions. That investigative reporters are capable of excesses no objective observer of the media would deny. But in a free country, a free press guarantees our freedoms by casting a cold and critical eye upon the performance and pretensions of those who aspire to or hold public office, or for other purposes seek public attention. The First Amendment ensures full, vigorous, uninhibited, fearless— in short, *free*—discussion, be it praise or criticism, of public figures, without the intimidating risk of libel suits. Whether public figures like it or not, the First Amendment sanctions all the news that is constitutionally fit to print. But the Constitution does not protect publication of known or probable falsehood. That news is unfit to print. If also defamatory, it is actionable.

The same considerations apply to the hostility and distrust towards Herbert which Lando manifestly developed during the course of his investigation. Lando did not start out that way: there is no reason to doubt his assertion that Herbert favorably impressed him in their initial contacts, or that Lando first visualized the "60 Min-

utes" segment as pro-Herbert and anti-Army. Indeed, as late as Lando's March 19, 1972 memorandum to Wallace (PX 10), which I have quoted *supra*, Lando was clearly suspicious and skeptical of the Army. But it is clear that during the succeeding months, Lando's mind set underwent a sea change. It is no exaggeration to say that Lando came to regard Herbert with emotions resembling hatred and contempt. Herbert could with justification regard the program and article as negative and "snide" towards him. One can sympathize with Sgt. Major Bittorie for regarding the program as a "hatchet job." But none of this, standing alone, amounts to actual malice in the constitutional sense. On this point, I cannot improve upon Judge Brieant's analysis in *Reliance Insurance Co. v. Barron's, supra*, at 442 F.Supp. 1352:

"The Court has read the article, the depositions, the answers to interrogatories and the exhibits submitted in connection with this motion. The Court has found no factual support for the contention that defendants published the article with 'actual malice.' The Court did, of course, notice the uncomplimentary tone of the article. But this does not in any way tend to prove that the author knew that statements in his article were false or that he had a reckless disregard, that is, entertained a serious doubt, as to the truth or falsity of his article. The fact that the publishers allowed the 'snide' tone to permeate the article similarly is no evidence that the article was published with actual malice. We recall once again that 'actual malice' does not mean hatred or contempt. Journalists are entitled to have and to express such views; that is no more than robust First Amendment expression.

"The Court is aware that any article replete with snide innuendos can be hurtful to a subject, and indeed may damage him in his business or reputation. But if he is a public figure, then he must bear the risk of such publicity as the price he pays for conducting activities or business in

the public arena. If the financial press, or the press at large, had to fear libel suits when expressing dislike of certain persons or firms, or of business or other practices, the self-censorship that would inevitably occur would have a stifling if not smothering effect on the functioning of a free press. Public figures are exposed to public comment. Such comment will not be libelous unless the commentator wrote with 'actual malice,' as defined by the Supreme Court, and as contrasted with actual malice, or mere aversion or scorn."

Of course, as Lando unearthed statements or documents unfavorable to Herbert's contentions, Herbert vigorously challenged their veracity or reliability. But it is equally clear that such denials do not furnish clear and convincing proof of actual malice. As Chief Judge Kaufman stated in *Edwards, supra,* at 556 F.2d 121:

> "Surely liability under the 'clear and convincing proof' standard of *New York Times v. Sullivan* cannot be predicated on mere denials, however vehement; such denials are so common-place in the world of polemical charge and counter-charge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error."

It is perhaps appropriate to point out that in submitting the statements in this case to constitutional analysis, the Court does not undertake to decide who is telling the truth. This opinion should not be read that way. For example, whether or not Lt. Col. Herbert actually reported war crimes to Col. Franklin in Vietnam on February 14 is known to Herbert, to Franklin, and also to God (at least I believe so), but is not found one way or the other in this opinion. My more limited analysis deals only with

whether, on the basis of this record produced by painstaking discovery, a reasonable jury could find falsity; *and,* with convincing clarity, the requisite guilty knowledge.

Thus I conclude this section of the opinion with the question with which it began: has Herbert, in response to the CBS defendants' motion for summary judgment, demonstrated that a reasonable jury could find upon clear and convincing proof that Lando, Wallace and CBS were guilty of actual malice in the publication of false and defamatory statements? As to nine of the eleven challenged statements, I answer that question in the negative as a matter of law.

■ Accordingly what emerges at the end of this analysis are two statements which a jury could find were false, defamatory and made with knowledge of actual falsity: "Bittorie had no sons" (the article), and "to a man" those who saw Herbert in Vietnam after his relief "say that Herbert never once said to them that he had been relieved because he had tried to push war crimes charges" (the program).[2] It is of course conceptually possible that of a number of allegedly actionable statements, some may impose liability if the jury finds the facts in plaintiff's favor, while other statements may not be actionable as a matter of law. The existence of one actionable statement is sufficient to defeat summary judgment in favor of the defendants concerned. Here there are two. Leaving Atlantic Monthly for consideration *infra,* Lando is implicated in the first of these statements and Lando, Wallace and CBS in the second. A trial involving those defendants in respect of those statements is accordingly required. But the CBS defend-

---

**2.** In his decision denying CBS's motion for summary judgment in *Westmoreland v. CBS Inc.,* 596 F.Supp. 1170 (S.D.N.Y., 1984), Judge Leval, undertaking a comparable analysis, pointed to several editing changes in a "CBS Reports" documentary's interviews or documents which a jury could find constituted deliberate falsifications by defendants. At 1174–1177. In respect of physical editing, no comparable incidents are revealed by the record in this case. Herbert complains that remarks he made at the beginning of his interview were transposed to the end. This may be questionable journalistic practice, but the contents of Herbert's remarks were not altered, and whatever misleading impression was generated does not rise to the level of knowing publication of a falsehood in the guise of fact.

ants' motion for summary judgment, in the light of the foregoing analysis, has been partially granted, and the issues substantially narrowed for trial. An order will issue under Rule 56(d),[3] following further submissions of counsel on that subject.

This division of defendants' statements into actionable and non-actionable also will presumably have an impact upon plaintiff's right to compensatory damages, assuming that he prevails on one or both of the actionable statements. While I do not rule on the point now because counsel have not yet addressed it, there is analogous authority for the proposition that Herbert can be compensated only for damages resulting from actionable statements, thereby requiring an allocation of damages between those statements which were injurious to reputation but non-actionable and those that are actionable. *Cf. Baden v. Koch,* 79 Civ. 4296–CSH (S.D.N.Y.), decided July 24, 1984, at 133–156 and cases cited (in civil rights action under 42 U.S.C. § 1983 for violation of liberty interest, where discharged public employee was denied name-clearing hearing after publication of stigmatizing charges against him, some of which were proved at trial to be true and others false, truthful charges, albeit stigmatizing, constitute noncompensable cause of damaging emotional distress). Plaintiff's claims for punitive damages are not involved in this discussion. Further briefs on this point will be invited from counsel.

**3.** Rule 56(d) provides:

"Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just.

## IX.

### *The Alternative Defenses Asserted by Lando, Wallace and CBS*

I have previously referred to the three alternative defenses urged by Lando, Wallace and CBS. In summary, they are that the program and article constitute protected reportage of a public controversy about a public figure, under *Edwards v. National Audubon Society, Inc., supra;* that the program and article constitute protected expressions of opinion about the same; and that the selection of information for inclusion in the program and article was a matter of editorial judgment beyond the competence of the courts.

While counsel's discussions of these issues in their briefs are able and provocative, I need not reach them in view of my conclusions on the issue of actual malice.

As noted under Point VIII, *supra,* nine of the eleven challenged statements could not be found by a reasonable jury to be false, defamatory and made with actual malice. That ends the case as far as those statements are concerned.

The remaining two statements, as to which trial is required, are actionable because a jury could find that the defendants in question uttered them deliberately and with knowledge that they were false. None of the three alternative defenses asserted by defendants would protect them from the consequences of such conduct. Accordingly I need not reach any conclusions in respect of the alternative defenses.[4]

Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly."

**4.** Even as to the nonactionable statements, the CBS defendants' reliance upon *Edwards, supra,* appears doubtful. The constitutional privilege of neutral reportage and the common law privilege of fair report articulated in *Edwards* are not available where the news media "did not simply report the charges but espoused or concurred in them," *Cianci v. New Times Publishing Co., supra,* at 639 F.2d 69 (per Friendly, Ct.J.). That is what the program and article do *vis-a-vis* Herbert; "more naivete than ought to be demanded even of judges is needed to consider [them] as doing anything else." *Ibid.* The blan-

## X.

### *The Motion for Summary Judgment on Behalf of Atlantic Monthly*

Atlantic bases its motion for summary judgment solely upon the actual malice issue arising from *New York Times v. Sullivan* and its progeny.

 The case for Atlantic Monthly is that it published an unsolicited, inherently plausible article authored by Lando, an apparently responsible journalist, who responded satisfactorily to whatever questions Atlantic's editors and attorneys raised about the article's contents. Atlantic conducted no independent inquiry into the facts because that is not its practice. It maintains no research department. Atlantic's editing process—the use of an introductory "streamer," graphics, and the suggestion of additions to or modifications of the text—were routine, and did no more than accurately summarize or reflect the article's contents. If the article contained defamatory falsehoods about Herbert, Atlantic concludes, it had no knowledge of their actual or probable falsity.

If established, these propositions entitle Atlantic to summary judgment. Herbert's burden in resisting Atlantic's motion is the same as he faces against the other defendants. He must show that Lando's *Atlantic Monthly* article contained false statements defamatory of Herbert; and also that Atlantic's editors (as opposed to Lando) published those statements with subjective awareness of their actual or probable falsity.

Herbert's burden is the same in principle, but obviously more difficult in practice. While unusual circumstances may blur the lines of demarcation, *cf. Gertz v. Robert Welch, Inc.*, 680 F.2d 527 (7th Cir.1982), ordinarily there are significant differences between author and publisher in the context of a defamation suit. The author researches the facts. He travels afar, interviews witnesses, and pores over documents. He forms opinions and arrives at conclusions. He distills all this in an article, and sends it unbidden to a potential publisher who, relying on the author's stature and integrity, publishes it. Assuming *arguendo* that the author has maliciously adulterated his text with known or probable falsehoods, it hardly follows that the publisher is aware that he did so. And yet that is what the public figure defamation plaintiff must show to hold the publisher liable. In these circumstances, it is not surprising that courts have on occasion denied summary judgment to an author, while granting it to the publisher. *See, e.g., McManus v. Doubleday*, 513 F.Supp. 1383 (S.D.N.Y.1981).

 In the case at bar, plaintiff is critical of much that Atlantic did or did not do. An example of the latter is the undisputed fact that Atlantic did not conduct an independent investigation into Lando's criticisms of Herbert. Plaintiff's brief (at 230 and 235) characterizes this as an "active pre-publication effort to avoid information disclosing falsity," and a "rejection of any immediate rebuttal information and the absence of even the most minimal investigation or verification effort in the rush to get the article into print ..." Stripped of rhetoric, this means that Atlantic did not investigate the facts itself before publishing the article. But it was under no obligation in law to do so, at least in the circumstances conceded to exist in this case.

Atlantic had nothing to do with researching or preparing the program. Therefore whatever truths Herbert may claim Lando or Wallace buried or distorted, or lies they told, during the course of that investigation and preparation cannot be ascribed to Atlantic.

Atlantic received Lando's manuscript as an unsolicited candidate for publication in *Atlantic Monthly*. The magazine was one

---

ket immunity sought to be invoked under the rubric "editorial judgment" has, in public figure defamation cases, been rejected by an unbroken line of Supreme Court cases beginning with *New York Times v. Sullivan*, of which *Herbert v.*

*Lando, supra,* is not the least instructive. The more limited defense based upon protected expressions of opinion is perhaps more substantial, but for the reasons stated I need not reach it.

of several Lando was considering as a potential vehicle for publication. Atlantic cannot therefore be regarded as the instigator of a piece intended to debunk or defame Herbert. *Cf. Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 538–39 (7th Cir. 1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983).

Lando, the contributor of this unsolicited work, was not a wild-eyed unknown, mouthing an improbable yarn about a prominent person. Rather, he was known to Atlantic's editors to be a former reporter with *Time* magazine and present producer of a respected (by many, at least) national news program. Lando had previously written a piece which *Atlantic Monthly* published. At the time of that publication (1967), Atlantic's editors had been favorably impressed with Lando's reportorial skills; and Manning had made inquiries about Lando at *Time,* receiving an equally favorable report.

The factual account related in the article, while unfavorable to Herbert, cannot be regarded as inherently implausible. Lando described the breadth and depth of his investigation. Furthermore, the article quotes at length from the transcript of the "60 Minutes" program. The Atlantic editors were thus aware that one of the main thrusts of the article (the existence of reasons to doubt Herbert's credibility) had already been passed upon by editorial quality control at CBS. To be sure, Herbert is not impressed by the integrity of that process; but the question in respect of Atlantic is whether Atlantic had reason to doubt Lando's veracity or the accuracy of his account. The fact that much of the article's substance had previously been broadcast by a respected news program was a factor the Atlantic editors were entitled to consider.

In addition, as the Atlantic editors' affidavits make clear, they had independent reasons for good faith doubts about Herbert, which had the converse effect of lending credibility to Lando. A number of journalists had written articles increasingly skeptical of Herbert's charges against the Army. Atlantic was aware of an unfavorable review of Herbert's earlier book about the Korean war, written by a respected military historian, General S.L.A. Marshall. Marshall cast doubts upon Herbert's credibility. Finally, Herbert, through his literary agent, McCauley, had in June of 1972 sent to Atlantic a copy of Herbert's own book *Soldier* for possible serialization. Various Atlantic editors expressed doubts about its believability in written memoranda which antedate the submission of Lando's manuscript to Atlantic.

Of course, the thrust of Lando's article is distinctly critical and negative towards Herbert. Being able to read, the Atlantic editors instantly perceived this. The editors, counselled by their attorneys, put questions to Lando which he answered to the editors' satisfaction. They also suggested relatively minor changes in language, which Lando accepted without demur.

It is also significant that Herbert and his literary agent knew several weeks in advance of publication that *Atlantic Monthly* was going to publish an article by Lando about Herbert. Herbert and McCauley had to expect that Lando's article would reiterate in considerable degree the contents of the program—as indeed it did. But the Herbert interests did not call to Atlantic's attention any *specific* falsehoods which they perceived in the program. They took up with Atlantic the *general* possibility of printing a riposte in the same issue. After publication there was a continuing dialogue about a response or critique on Herbert's behalf. None of these activities gave Atlantic pre-publication notice of specific, actual or probable falsity.

Plaintiff cites me to no case holding or suggesting that in circumstances comparable to these, a publisher like Atlantic is legally obligated to conduct an independent investigation into the facts asserted in an independent author's unsolicited manuscript. Indeed, controlling Supreme Court authority is precisely to the contrary. In *St. Amant v. Thompson, supra,* the Court in expanding further upon *New York*

*Times v. Sullivan*'s concept of "recklessness" said at 390 U.S. 731, 88 S.Ct. at 1325:

". . . reckless conduct is not measured by whether a reasonably prudent man would have published, or *would have investigated* before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." (emphasis supplied).

■■■ *St. Amant* also holds that the defendant publisher would be in difficulty if what he published was "inherently improbable," or there were "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732, 88 S.Ct. at 1326. That was the case in *Curtis Publishing Co. v. Butts, supra,* where the magazine publisher accepted without question unsupported charges against a respected football coach levied by a felon convicted of forging checks. Comparable liability was visited upon the publisher in *Goldwater v. Ginzburg,* 414 F.2d 324 (2d Cir.1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970), where the publisher knew that an article's researchers had falsified and fabricated answers to a questionnaire which formed part of the research. However, "in the absence of an evidentiary showing that a publisher has good reason to suspect . . . falsity," the publisher is under no legal duty to conduct an independent investigation into what an independent author has written. *Nader v. De Toledano, supra,* at 408 A.2d 57.

■■■ To be sure, the tenor of Lando's article reflected his "bias" against Herbert, if by "bias" we mean strong disapproval or dislike, even bordering (as suggested under Point VIII, *supra* ) upon hatred and contempt. But Lando's animosity toward Herbert, standing alone, was sufficient neither to place Atlantic on notice of the actual or probable falsity of anything Lando said, or to require Atlantic to conduct an independent investigation before publishing. Those arguments, which Herbert asserts, were laid to rest by the Second Circuit in *Hotchner v. Castillo-Puche, supra,* in which the author, Puche, wrote a book about Ernest Hemingway containing references unfavorable to one of Hemingway's acquaintances, Hotchner. Hotchner sued the book publisher, Doubleday, and offered evidence that Doubleday's editors were aware of Puche's dislike of him. This Court denied Doubleday's motion for summary judgment, referring to that evidence and the existence of some errors in the book known to Doubleday, concluding that "the jury might . . . find that, in light of their knowledge of Puche's low regard for Hotchner, Doubleday's employees were culpably reckless in not investigating further, or deleting the defamatory remarks." 404 F.Supp. 1041, 1049 (S.D.N.Y.1975). The case went to trial and a jury gave damages to Hotchner. The Second Circuit reversed, and directed dismissal of the complaint as a matter of law:

"While Castillo-Puche's denunciations of Hotchner were sufficient to put Doubleday on notice of Castillo-Puche's animosity toward Hotchner, there was no reason to believe that Castillo-Puche had never really observed Hotchner. Knowledge of an author's ill-will does not by itself prove knowledge of probable falsity. Cf. *Goldwater v. Ginzburg,* 414 F.2d 324, 342 (2d Cir.1969). Thus, the evidence does not demonstrate that Doubleday had cause seriously to suspect that Castillo-Puche's opinions of Hotchner were without foundation. Doubleday's failure to conduct an elaborate independent investigation did not constitute reckless disregard for truth. Cf. *St. Amant v. Thompson, supra,* 390 U.S. at 733, 88 S.Ct. 1323; *New York Times Co. v. Sullivan, supra,* 376 U.S. at 287–88, 84 S.Ct. 710." 551 F.2d at 913–14.

*See also Loeb v. New Times Communications Co., supra,* at 497 F.Supp. 92 n. 12; *Fadell v. Minneapolis Star and Tribune Co.,* 425 F.Supp. 1075 (N.D.Ind.1976), *aff'd,* 557 F.2d 107 (7th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977); *Martin Marietta Corp. v. Evening Star Newspaper,* 417 F.Supp. 947, 959 (D.D.C.1976); *McManus v. Doubleday, supra; Rinaldi v. Holt, Rinehart,* 42 N.Y.2d

369, 382–83, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977).

The cases which plaintiff cites in support of Atlantic's asserted duty to conduct an independent investigation turn upon entirely different fact situations, and furnish no authority for fixing liability upon Atlantic in this case.

Nor can liability arise from the contributions which Atlantic made to the article. Atlantic editors composed the introductory "streamer," but the streamer's obvious purpose was to identify and summarize the contents of the article. There is no suggestion that the streamer did this inaccurately, or that it introduced factual assertions which are not made in the article itself. The graphics of the progressively riddled soldier-silhouette stand upon the same footing. They accurately depict one of Lando's themes: that he first believed in Herbert, but his belief was gradually eroded by a series of perceived factual discrepancies. No case of actual malice can be made from Atlantic's suggestion, accepted by Lando, that the text of the article contain the reference to General S.L.A. Marshall's unfavorable comments about Herbert. It is not suggested that General Marshall did not say these things, or that the quotation was false or fabricated. Finally, editing of the article's concluding paragraph so as to include the phrase "feet of clay" does no more than restate in colloquial form the very point that Lando was clearly stating in his article.

For these reasons, I regard Atlantic's "contributions" to the article as nothing more than editorial techniques intended to attract and retain the reader's eye, and summarize the contents of the article. As such, I do not regard them as constituting Atlantic's "endorsement" of the article, in the sense of proclaiming an independent *imprimatur* of its truth. However, even if these editorial contributions should be so regarded, there is no proof that Atlantic's editors knew of the actual or probable falsity of anything in the article. But the existence of such proof, of sufficient quantity and quality to permit a reasonable jury to form a clear conviction of Atlantic's guilty knowledge, was what plaintiff had to show to defeat Atlantic's motion for summary judgment.

Plaintiff having failed entirely to do so, the motion of Atlantic for summary judgment will be granted.

## CONCLUSION

The motion of the Atlantic Monthly Company for summary judgment is granted. The Clerk of the Court is directed to dismiss the complaint as against that defendant with prejudice and with costs.

The motion on behalf of defendants Lando, Wallace and CBS for summary judgment is granted in part and denied in part. The case will go forward in conformity with this opinion. I make no order at this time with respect to costs as to those defendants.

It is SO ORDERED.